60 So.2d 615 (1952)
KRAEMER et al.
v.
STATE.
Supreme Court of Florida, Division A.
August 26, 1952.
Rehearing Denied October 16, 1952.
M.H. Jones, Milton D. Jones, Clearwater, and Atkinson & Atkinson, Tallahassee, for appellants.
Richard W. Ervin, Atty. Gen., and William A. O'Bryan, Asst. Atty. Gen., for appellee.
HOBSON, Justice.
This appeal is from a final judgment of conviction of the appellants on the charge of possession of tickets in a lottery that had not yet been played.
Is is disclosed by the evidence that Officer Dietrich received an anonymous telephone call on the evening of July 26, 1950. He was informed by the person who called him that two unidentified cars had been habitually meeting each other at night for approximately one month in the vicinity wherein the informant resided. Officer Dietrich was also told that these cars would usually approach one another from opposite directions, blink lights, stop opposite each other and then drive on. On the evening of the day upon which Officer Dietrich received the aforementioned telephone call he and Officer Nutt parked two police cars in a private driveway in the middle of the twenty-five hundred block on Second Avenue, North, in the City of St. Petersburg, Florida. The officers waited until about 8:30 or 8:45 o'clock when they observed a car coming eastbound on Second Avenue which stopped and turned off its lights about a block from where the officers were stationed. Shortly thereafter another car came from the opposite direction on Second Avenue, North. As this car approached, the eastbound car started up and met the westbound car at or near the intersection of 24th or 25th Street and Second Avenue. Neither officer recognized the eastbound car or the driver thereof and they did not get its license number; nor did either get the license number of the westbound car or recognize it or its occupants.
When the two cars stopped both officers ran to their automobiles but by the time Officer Nutt had driven his car out of the driveway the westbound car, which it was pre-arranged he was to follow, had disappeared. *616 He attempted to locate the westbound car but admittedly could not identify it. However, when he saw a car on 25th Street approaching Central Avenue about two blocks away from him, he "took a chance" that it was the car he was intending to apprehend and followed it. After turning on to Central Avenue the car which he was following then went north on 26th Street. When it reached Burlington Avenue Officer Nutt drove alongside of the car and ordered the driver to stop.
It is clear that no probable cause existed to justify the officer in stopping the car or in making a search, which we are convinced he did make, for contraband. Not only does the record disclose the fact that the officer examined the driver's license of appellant Walter Kraemer, flashed his light into the interior of the car, conversed with Kraemer and inquired about a package that he saw on top of some clothes in a clothes basket on the back seat of the car, but, according to officer Nutt's own testimony, at the time he asked Kraemer what the package was he "sort of lifted it up." When asked the question whether he picked the package up his answer was "I did not take it out; I picked it up and laid it back." Officer Nutt was asked if he looked under it, meaning under the package. His answer was, "Yes, sir." The foregoing testimony convinces us that an illegal search was commenced at that point and that the packages which the appellant Atilia Kraemer later attempted to push under the car with her foot, one of which was subsequently found to contain lottery numbers and the other a sum of money, were seized as contraband consequent upon such illegal search.
The mere fact that officer Nutt, after halting the car in which appellants were riding without probable cause, inquired as to what was in the package on the back seat and flashed his light in the car might not be said to have amounted to a search but when he went further, reached into the car, picked up the package and looked under it he was, without doubt making a search. Moreover, it cannot be said that the search was incident to a lawful arrest because the arrest had not up to that time actually been made, nor would it have been lawful had it been made. It is also extremely doubtful that the arrest when made was lawful because, although the officers looked into the packages after retrieving them from the street and saw money and some sealed envelopes, it was not until the officers had arrested the appellants and had taken them to the police station that the sealed envelopes were opened to ascertained their contents. They were found to contain lottery tickets. Up to that point no contraband distinguishable as such had been seen in the possession of these appellants by either officer. No law was violated by the appellants in the presence of the officers and they were not armed with a search warrant. A search must be lawful in toto and one that is unlawful ab initio is not made lawful by what is found in consequence thereof. See Cornelius on Search and Seizure, 2nd Ed., Sec. 31, page 86, and cases therein cited.
"If a seizure is based on a mere suspicion, and the facts do not justify an arrest, the subsequent discovery by an examination of the evidence secured by the seizure that the suspicion was well founded is not sufficient to make what was unlawful at its commencement a lawful search." Garske v. United States, 8 Cir., 1 F.2d 620, 621.
"It was against such prying, on the chance of discovery, that the constitutional amendment was intended to protect the people. Neither is the discretion of the officer, however good and well-intentioned, a substitute in law for a search warrant issued by a proper magistrate." United States v. Slusser, D.C., 270 F. 818, 819.
We are not unmindful of the fact that many upright citizens are apparently righteously indignant when they feel that a criminal has evaded punishment for his transgression upon what they consider to be a legal technicality. These same citizens are strengthened in the oft-expressed lay view that "It is all law and no justice" and are at times hypercritical of the courts. It might be stated in all fairness that our *617 courts in some instances may by strained or tenuous constructions have invited criticism of this character, which fact merely serves to demonstrate that judicial officers are after all only human. Upon sober reflection it should be obvious to everyone that all of us as citizens are responsible for the existence of the Fourth Amendment to the Federal Constitution, as well as Section 22 of the Florida Declaration of Rights, F.S.A. Moreover, the protection afforded by the Fourth Amendment, supra, and Section 22 of our Declaration of Rights, as was said by Mr. Justice Butler of the United States Supreme Court in the case of Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 6, 70 L.Ed. 145, "* * * extends to all equally  to those justly suspected or accused, as well as to the innocent."
The fundamental difference between our form of government and that of the totalitarian states lies in the fact that our constitution provides for and protects the rights, privileges and immunities of the individual. "The right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches * * *" is certainly one of our most cherished personal rights. Should the courts fail to recognize and invoke the protection afforded by the Fourth Amendment to the Federal Constitution and Section 22 of our Declaration of Rights they would surely lend a helping hand to those who patently desire to bring to this Continent the oppressive and iniquitous form of government which would change this Nation of free people into an enslaved group of puppets. Indeed it is both desirable and necessary that those who violate the laws, which are ordained and established for the protection of an ordered society, be punished. Nevertheless, infringement upon rights guaranteed by the organic law should never be permitted. Even law enforcement officers should not be allowed to invade constitutional rights upon nothing more than suspicion, although ultimately justified; nor should suspicion be substituted for known facts which alone can form a lawful basis for probable cause. The countenance of such procedure would be but the initial step toward the introduction of "gestapo" methods. The end result of such an invasion of personal constitutional rights does not justify the means by which it was attained. As was stated by Mr. Justice Mathews when speaking for this Court in his clarification opinion filed June 27, 1952 in the case of Borrego v. State of Florida, 62 So.2d 43, 46: "It is more important that the Constitution be upheld and fundamental rights guaranteed by it be protected, than it is for a conviction to be obtained in a particular case with illegal evidence."
Our problem, and we use the plural pronoun designedly for indeed it is one common to all citizens, may be solved by a thoughtful informed and interested electorate. Law enforcement officers should be selected with great care and we should see to it that they are trained and become thoroughly qualified as such. Numerous instances have come to our attention in which we were convinced that the officer or officers could easily have made a lawful search and seizure but failed to do so either because of a callous disregard of constitutional rights of their fellow citizens or a lack of proper training and instruction. Ofttimes it has appeared that our prosecuting officers could have been more thorough in presenting the state's case in a criminal action. All of which results in public indignation, largely directed at the courts and not always properly so directed. The time has not yet come  Deo volente may it never arrive  when an American citizen traveling in a lawful manner upon a public highway may be apprehended and his person and effects searched in utter disregard of his constitutional rights.
We are forced to hold that reversible error was committed when the trial judge denied appellants' motion to suppress the evidence and also when he overruled the objections to the introduction of the lottery tickets and the money.
Reversed.
SEBRING, C.J., and TERRELL, MATHEWS and ROBERTS, JJ., concur.
THOMAS, J., dissents.
*618 THOMAS, Justice (dissenting).
The appellants were found guilty of possession of tickets in a lottery that had not at the time been played, and were sentenced to serve one year in the state prison.
The two questions they now present relate to the validity of the search and seizure that produced the lottery tickets. They insist that no probable cause existed either to halt the car in which they were traveling, or to explore it for contraband; and that the currency and papers, eventually procured by the officers who stopped them, were inadmissible in evidence.
Before discussing the legal questions I shall attempt to reconstruct the occurrence from the versions of the only persons who testified with respect to the charges against the appellants, two police officers. One of them was told over the telephone, anonymously, that nightly for a month two unidentified cars had met in the informant's neighborhood and, after the drivers had signaled with the car lights as they approached each other, had stopped for a moment, then proceeded.
The evening he received this information about these unusual actions, this officer and another policeman parked their respective cars in the vicinity and took up their vigil. Presently, an automobile stopped close by and its lights were extinguished. Shortly afterward, another car came from the opposite direction, and the parked car went to meet it. Each officer then undertook to chase one of the cars. The officer who eventually accosted appellants seems to have lost track of the car he was to follow, but he soon overhauled an automobile he thought might be one of those that had rendezvoused. When he drove alongside, he ordered the driver to stop.
Doubtless at this point, the patrolman, being unsure even that the car was one of those he had seen at the meeting, had no cause to stop the vehicle or make any search; and up to this time, the facts seem to serve little purpose except to furnish an historical background for what now happened.
The patrolman examined the driver's license of the appellant, Walter Kraemer; he flashed his light into the interior of the car; he talked to Kraemer about where he had been, was going, and so on; he inquired about a package he spied in the car.
Then the companion officer drove up, examined Kraemer's license, and conversed with him much as the first officer had done. While this colloquy was in progress, the appellant, Atilia Kraemer, opened the right hand door and stepped out, whereupon one of the policemen went to her side of the car and observed her pushing two packages underneath with her foot. One was found to contain lottery numbers; the other, money.
We have spoken often on the subject of searches and seizures, both of houses and vehicles, and it hardly seems necessary again to discuss the law on the subjects or, in view of the facts of this case, to elaborate on the principles involved or the protection afforded the citizen against unlawful invasion of his rights.
The appellants' argument proceeds on the theory that the anonymous telephone message furnished no probable cause, and I quite agree that they were entitled to free passage without search unless the officer knew of "* * * probable cause for believing that their [vehicle was] carrying contraband or illegal merchandise." Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 285, 69 L.Ed. 543, 39 A.L.R. 790.
I have not found in the record a sufficient showing that probable cause as a basis for a valid search was established either by the intelligence from the unknown informant, or by subsequent events. The fact that cars were approaching each other periodically, blinking their lights, stopping momentarily, and passing on might arouse curiosity, or even suspicion, but that would not be sufficient ground for believing that either or both actually bore contraband. Such a conclusion would result more from imagination than reason. For ought informant or officers knew, it was an innocent tryst.
More importantly, the officer who halted appellants admittedly lost sight of the meeting cars; did not know, when he finally set out, where the suspect cars had gone. *619 When he finally overtook and stopped appellants' car, he was impelled by nothing stronger than a "hunch." He did not actually know what, or for whom, he was looking.
So I conclude that belief of probable cause that any one, much less the appellants was engaged in violating the law was wholly lacking, and there was no authority for searching their automobile.
Were the matter to end here it would appear to be the court's clear duty to hold that the lottery tickets were obtained by unlawful search and that the judgment should be reversed and the appellants discharged. But disposition of the case does not seem to me to be as simple as that.
The appellants were stopped but were not arrested; they freely conversed with the officers; the appellant, Walter Kraemer, readily displayed his driver's license upon request. I discover nothing in the officers' actions that amounted to a search either of the person or the vehicle. Neither of the occupants was asked to leave it.
I think the immediate vital situation arose when the appellant, Atilia Kraemer, voluntarily stepped out of the automobile and was surprised as she edged the sacks containing the lottery tickets and the currency under the car. Had she and her husband remained in their seats and stood upon their rights, the car could not have been legally searched, in view of the want of probable cause; and had the officers searched it, the evidence thus obtained would have been suppressed.
But such was not the case. No tickets were taken from the car, or attempted to be, but rather from the surface of a city street. It seems to me these tickets were, therefore, not produced by search of person or vehicle. They were properly admitted in evidence against both appellants  against the woman because she was attempting to hide them, against the man because of his obvious association with the woman.
I think it stretches the guaranties of the constitution beyond all logical or reasonable symmetry to hold that the rights of these "* * * people to be secure in their persons, * * * papers and effects against unreasonable seizures and searches," under Sec. 22, Declaration of Rights, Florida Constitution and to like protection under the Fourth Amendment to the Constitution of the United States, were violated, when one of them was seen to be kicking a package of lottery tickets under a vehicle which would have been a haven for both had they elected to remain in it. One of them left it for the obvious purpose of concealing or disposing of the contraband.
Appellants' position that the officers' picking up the packages was but a continuation of an invalid search has little appeal to me because I think no search was ever actually begun.
For the reasons given I dissent from the opinion of a majority of the Court.