65 So.2d 61 (1953)
COLLINS et al.
v.
STATE.
Supreme Court of Florida, Division B.
March 31, 1953.
Rehearing Denied April 29, 1953.
*62 Sam E. Murrell and Sam E. Murrell, Jr., Orlando, for appellants.
Richard W. Ervin, Atty. Gen., George E. Owen and Boone Tillett, Jr., Asst. Attys. Gen., for appellee.
THOMAS, Justice.
The appellants, with a companion, were apprehended as they traveled in a car on a highway and were found to possess tickets and other articles of such character and amount as readily to convince the jury and the court that they were involved in the promotion of a lottery.
We see no occasion to record here a digest of the testimony relating to the charge, but will dispose of this aspect of the case by observing that there was abundant proof to establish guilt, if the evidence deriving from the search was competent.
The particular phase of the appeal with which we feel obliged to deal at length is the manner of securing the evidence. A deputy sheriff and an inspector of the State Beverage Department had received information that the appellants were involved in lottery operations now quite commonly known as "Cuba" and "bolita". The deputy and the inspector were patrolling when the car driven by the appellant Frank Collins overtook them. The officers followed for about a mile and saw Collins drive a foot over the center line of the highway on three occasions. They halted Collins and detected on the rear seat a sack containing pads such as are used in the bolita drawings. The sack and its contents were evidently made visible when the inspector uncovered them after the deputy had ordered the occupants out of the car. To quote the inspector:
"Mr. McDaniels [the deputy] got out of my car first, walked up to Frank Collins car. I got out and walked up on the right-hand side. He told them to get out of the car and they got out of the automobile. The back door was open and I saw a raincoat laying on the back seat and I raised it up or moved it over, and I saw a sack of Bolita tickets there, I supposed it was." [Emphasis added.]
*63 The officers placed the appellants under arrest for violation of the traffic laws, handcuffed Frank Collins and the male companion and conducted all three occupants to the county seat. Although the sheriff asked Collins at the jail, "How about searching your car?" and received Collins' consent, the search had already begun at the time the appellants were stopped on the road, when the inspector removed a covering to reveal what it developed were pads used in the bolita racket. Kraemer v. State, Fla., 60 So.2d 615.
We have held that a reasonable search and seizure may be made as an incident to a lawful arrest, State ex rel. Stillman v. Merritt, 86 Fla. 164, 99 So. 230; Italiano v. State, 141 Fla. 249, 193 So. 48, so the validity of the search in the present case should be gauged by the circumstances surrounding it, Haile v. Gardner, 82 Fla. 355, 91 So. 376, there having been no pretense even that a search warrant was procured.
In the case of Brown v. State, Fla., 62 So.2d 348, the court disapproved the investigation disclosing that the vehicle stopped on the highway contained moonshine whiskey and held that the search without a warrant was not justified. In that instance the officers had arrested the appellants for swerving from one side of the center line to the other and, after the motor car was halted, one of the officers simply shined his flashlight into the interior of the car in the night-time.
In the absence of a warrant we turn to the statutes cited by the Attorney General relative to certain traffic regulations to see whether they were shown to have been violated in such fashion as to justify an arrest and a search incidental to that arrest, and in considering this aspect of the case we shall refrain from any discussion of the need for a relationship between property seized as an incident to an arrest and the crime for which the arrest is made, because the point is not now presented.
The most serious misconduct that can be charged to the driver of the car, the appellant Frank Collins, is that on three occasions, in the course of a mile or so, he drove one foot over the center line of the highway. This must have constituted a felony or misdemeanor to have warranted the arrest. Sec. 901.15, Florida Statutes 1951, and F.S.A. Passing to that part of the statute, defining the offense of driving on the wrong side of the road, on which the Attorney General relies, we find that "No vehicle shall at any time be driven to the left side of the roadway * * * When approaching the crest of a grade or upon a curve in the highway where the driver's view is obstructed within such distance as to create a hazard in the event another vehicle might approach from the opposite direction * * *." [Emphasis added.] Sec. 317.30, Florida Statutes 1951, and F.S.A. It is not a violation of the law to get entirely in the left lane, much less a foot over the line, unless a hill or curve is being approached  and not even then unless the driver's view is obscured  and not even then unless the obstruction is so near as to create a hazard. How can it possibly be said that to put a car one foot beyond the division ipso facto empowers an officer to stop, arrest and handcuff? Not one word have we found in the testimony of the deputy sheriff or the inspector that any of the conditions appearing in the statute prevailed except the generality that the incident occurred in "hilly country".
A holding that such a feeble reason would justify a halting and searching would mean that all travelers on the highway would hazard such treatment, for who among them would not be guilty of crossing the center so much as a foot from time to time. All could, therefore, be subjected to inconvenience, ignominy and embarrassment on the excuse that an occasional incident might yield some contraband or other.
To use the words of Mr. Chief Justice Taft in Carroll v. United States, infra [267 U.S. 132, 45 S.Ct. 285]:
"* * * those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause *64 for believing that their vehicles are carrying contraband or illegal merchandise."
Plainly, the appellants were not committing a traffic violation in the officers' presence. Burley v. State, Fla., 59 So.2d 744.
Having concluded that there was no valid arrest, we approach the last phase of the question, that is, the justification by the facts of a search without either a warrant, or a legal arrest.
We preface our discussion of the point with the pronouncement that we have not the remotest idea of retreating from the position this court has taken in securing to persons the guaranties of the state and federal constitutions against unreasonable searches and seizures, nor of becoming phlegmatic as individuals to the oath each of us took, upon setting out on our judicial task, to "support, protect, and defend the Constitution * * * of the United States and of the State of Florida; * * *." Sec. 2, Art. XVI, Constitution of Florida, F.S.A.
Our discussion is now narrowed to the manner in which a search, without warrant, of a vehicle may be properly made, and the evidence obtained thereby may become competent. In other words, how strongly must an officer believe a fleeing car is carrying contraband for the officer to halt the vehicle and search it, without warrant, and make the articles seized by him admissible in evidence?
As early as nineteen twenty-four the Supreme Court of the United States, in Carroll v. United States, 45 S.Ct. 280, 286, 267 U.S. 132, 69 L.Ed. 543, enacted as Florida law by the Legislature, Chapter 12257, Laws of Florida, Acts of 1927, recognized the distinction between a prerequisite of a warrant for the search of a private dwelling and for the search of a motor-car. The reason is obvious. Because of the high degree of mobility of automobiles efforts of officers to apprehend persons carrying contraband in them would be thwarted if no searches of such vehicles could be accomplished under any circumstance except by authority of warrants.
The court in that case held that a search warrant should be procured if "reasonably practicable". Thus would the searcher be protected against suit for damages. "In cases where seizure is impossible except without warrant," remarked the Chief Justice, "the seizing officer acts unlawfully and at his peril unless he can show the court probable cause." [Emphasis added.]
Of like effect was the opinion of the Supreme Court of the United States in Husty v. United States, 51 S.Ct. 240, 282 U.S. 694, 75 L.Ed. 629, where "probable cause" was designated the criterion for determining the validity of the seizure without a search warrant.
This court has adopted the same rule. In Longo v. State, 157 Fla. 668, 26 So.2d 818, 819, the judgment was affirmed although evidence taken in a search without a warrant was introduced against the appellant. There was proof that he had consented to the search but the court said that "even had consent to a search not been given" the facts "within the knowledge of the arresting officers at the time the arrest was made were sufficient to warrant a reasonable belief that lottery tickets were being transported * * *." [Emphasis added.] The court concluded that this belief justified the search and seizure without warrant.
We went even further in Brown v. State, Fla., 46 So.2d 479, and held that where the officer had "trustworthy information" that a car was carrying contraband he could arrest the driver and seize the contents for use in the trial, although a search warrant had been obtained and held invalid because of defects in the affidavit on which it was based.
This sends us back to Husty v. United States, supra [282 U.S. 694, 51 S.Ct. 242], where the court remarked that the "search was not unreasonable [simply], because * * * sufficient time elapsed between the receipt by the officer of the information and the search of the car to have enabled him to procure a search warrant."
Putting together the decisions of the Supreme Court of the United States and the decisions of this court, which we think are harmonious, we reach the conclusion that it *65 is safer procedure to secure a search warrant preliminary to stopping a motorist and searching his car; that if halting, searching and seizing are accomplished without such a warrant the officer must be prepared to show that he had "probable cause" for his acts or "reasonable belief" or "trustworthy information" that the car was engaged in the transportation of contraband.
We take these quoted expressions from our opinions to be synonymous with the one taken from the opinion of the Supreme Court of the United States and to mean that probable cause must be shown to justify search without warrant and to render the objects obtained thereby admissible in evidence. In this way the yardstick will be identical with that specified in the statute where it is provided, following a declaration that "The right of the people * * * [shall] be secure in their persons, houses, papers and effects against unreasonable seizures and searches * * *", that no search warrant shall be issued except upon "probable cause * * *." [Emphasis added.] Sec. 933.04, Florida Statutes 1951, and F.S.A. See also Sec. 22, Florida Declaration of Rights.
Summarizing, and consolidating the thoughts we have gathered from the authorities examined, we adopt the rule that where it is impossible or impracticable to secure a search warrant the officer making the search and seizure must be prepared to convince the court that the information he possessed was sufficient basis for the issuance of a warrant had he applied for one. By hearing testimony on the subject in an independent inquiry in the absence of the jury, as was done in the trial of this case, the trial judge can adjudicate the competency of the testimony and the evidence produced as a result of the search.
Following this rule we proceed to an examination of the circumstances surrounding the search in the instant case to see whether the requirement of probable cause was met, disregarding the question whether the appellants were stopped on the highway under the pretext that the driver of the car was operating it recklessly. As we have written we disapproved such a method in Burley v. State, supra, but we said there that the officers "had no reason to arrest Burley except for the traffic violation." There was, therefore, no occasion to determine whether the search was founded on probable cause regardless of the supposed infraction of traffic laws.
In the present case it was testified in an inquiry before the court, in the absence of the jury, by the deputy sheriff that he had been investigating the appellant Frank Collins for about a month and had information that he was a "pick-up-man". Parenthetically, it was testified at the trial that the function of pick-up-man in bolita-Cuba-circles is to collect the money from the riders who sell to the customers and to deliver the fund to the "banker", the principal operator. The witness had been told that "he [Collins] was delivering to Dunnellon across the river." He had been informed that the "head" was in Orlando and that "it [the money] would go from Dunnellon to Orlando." Intelligence of Frank Collins' activities had again reached the sheriff the morning of the arrest when he was informed that the tickets had just been sold and that "the money and tickets would be in that car" that was seized. Even before the abortive arrest for infraction of the traffic laws the officers knew the description and license number of the Collins car.
That was the material testimony before the judge relevant to the knowledge possessed by the officers on which must depend the presence or absence of probable cause.
Distilled to its essence, a deputy sheriff was informed that one of appellants whom he had been investigating for a month was involved in the bolita racket and had gambling paraphernalia in his car. The court was not enlightened about the informants or the nature of the investigation. Actually the defense counsel tried to develop the source of the information and the objection by the State Attorney to the question was sustained.
We think any magistrate to whom an application for search warrant was made based on the sole testimony of the deputy sheriff giving the meager information we *66 have detailed, without even divulging the source of his advices, would have promptly refused it.
Certainly at this late date, after repeated expressions of the courts on the subject, every well-informed officer should know that searches may not be lightly made and that if evidence gained from a search is to be properly introduced and a judgment founded thereon is to withstand the assaults upon it, likely to be made, the guaranties of the Constitution must be honored. However zealous an officer may be to stamp out the evil of the lottery he cannot throw caution to the wind and he cannot expect any courageous court to support him on the fallacious theory that "the ends justify the means." An "illegal search cannot be made legal by the fruits it produces." Brown v. State, Fla., 62 So.2d 348, 349.
It seems to be fitting to quote, in this connection, the words of Mr. Justice McReynolds in his concurring opinion in Carroll v. United States, supra [267 U.S. 132, 45 S.Ct. 288]:
"The damnable character of the `bootlegger's' business should not close our eyes to the mischief which will surely follow any attempt to destroy it by unwarranted methods. `To press forward to a great principle by breaking through every other great principle that stands in the way of its establishment; * * * in short, to procure an eminent good by means that are unlawful is as little consonant to private morality as to public justice.' Sir William Scott, The Le Louis, 2 Dodson [Adm.] 210, 257 [165 Eng. Reprint, 1464, 1479]."
Not only are constitutional principles paramount to convictions in isolated cases, but a question of economy is involved. Trials are expensive and if a conviction is blown apart because of too little emphasis on established law governing the obtaining of evidence both the defendant and the State lose.
In another question the appellants challenge a ruling of the trial judge admitting testimony of the deputy sheriff in the trial of the issue of guilt about what he had heard with reference to their activities in the county. The nature of the situation can better be understood by the reader if the record is quoted. After the inquiry before the judge and the return of the jury to hear the testimony, the deputy was asked this question: "Well, we are getting now to this particular case. Did you investigate Frank Collins and Esma Collins, you and the sheriff's office?" and replied, "I did." He said he had done so for "around a month." He was then asked: "Did you have information that Frank Collins and Esma Collins were in this business [lottery] in this county?" After an objection by appellants' counsel and a colloquy among the court and the attorneys the objection was overruled and the witness stated, "I did." This was followed by the question: "Did you have information that Frank Collins was collecting money in this proceeding and delivering it to some other person?" and he was permitted, over objection, to answer, "I did."
Out of fairness to the trial judge we should say that he admitted the testimony on the theory that it was material "to justify a basis for search and seizure." But it must be remembered that at this point the jury was in the box and they were being told, in effect, that an officer of the law had made inquiry and had been told by some one or other that the defendants were guilty. The testimony was obviously incompetent. Plainly the testimony was hearsay. Another reason for its incompetency was that the defendant was deprived of opportunity to cross examine the informant who was an accuser in absentia. The mischief that can result from such a method, and that did result in this case, is emphasized by what later transpired. The appellants had sought to prevent its introduction and failing that had asked: "Would you tell us the name of the party [the informer]?" The State objected and the objection was promptly sustained. So the damaging hearsay testimony was received by the jury over appellants' protest and the appellants were then deprived of any information about the source of the reports and left to suffer the consequences *67 without any opportunity either to cross examine or rebut. An officer may say what he did pursuant to information but he may not relate the information itself for such is hearsay. Kirby v. State, 44 Fla. 81, 32 So. 836. Of like effect and prejudice was the testimony of the inspector who had accompanied the deputy sheriff. This rule was announced in a decision cited by the Attorney General in the present case. Smith v. United States, 70 App.D.C. 255, 105 F.2d 778.
In the authorities to which we have been referred we have found no support for the course followed in respect of admitting testimony that a defendant on trial was said by some anonymous person to have been engaged in the very criminal transaction for which he was being tried.
In view of what we have written we consider it unnecessary to discuss, consider or decide the other questions propounded by appellants.
The judgment is reversed for a new trial.
ROBERTS, C.J., and HOBSON and DREW, JJ., concur.