**MIAMI BEACH FIRST NATIONAL BANK, et al v. CLARK, et al.
No. 14961.**

Circuit Court, Monroe County.
November 22, 1957.

Katzentine, Heckerling & White, Miami, and W. Curry Harris, Key West, for plaintiffs.

Helliwell, Melrose & Sanderson, Miami, for defendants.

AQUILINO LOPEZ, Jr., Circuit Judge.

This cause having come on to be heard upon the pleadings and briefs filed by counsel for the respective parties herein, and upon the testimony and exhibits admitted into evidence, and the court having read the transcript of the testimony, having examined the exhibits, having heard argument of counsel, and having considered the applicable law, makes the following Statement of the Case, Findings of Fact, Conclusions of Law and Decree based thereon.

### STATEMENT OF THE CASE

This Statement of the Case is a brief summary of such salient matter as the record shows to be undisputed, together with a statement of the position taken by the respective parties.

A petition for declaratory judgment was filed herein to determine homestead rights in certain real property located in Monroe County, as to the heirs of Harold A. Clark, deceased. The plaintiffs (i.e., petitioners) are the executors of the estate of Harold A. Clark, letters testamentary having been issued to them on January 25, 1955, by order of the county judge for Monroe County.

Clark is survived by his widow, Charlotte, (a co-plaintiff in her capacity as executrix and a co-defendant in her individual capacity) and three children born of a previous marriage — Pamela Clark Gardner, Stevenson Clark and Harold A. Clark, Jr.

The property in issue consists of two contiguous parcels —

1.   A tract of land in a part of Gov. Lot 1, Section 9, T.66S., R.32E., on Key Vaca, Marathon, Monroe County, Florida and being more particularly described by metes and bounds as follows: Commencing at the intersection of the West Line of Gov. Lot 1, Section 9, T.66S., R.32E., and the northwesterly right-of-way line of Old State Highway No. 4A, bear northeasterly along the northwesterly right-of-way line of Old State Highway No. 4A for a distance of 1396 feet to the point of beginning of the tract of land hereinafter described; from said point of beginning, bear North for a distance of 233.30 feet to a point; thence bear South 87 degrees and 50 minutes West along an existing Cyclone Fence for a distance of 100 feet to a point; thence bear North for a distance of 138.5 feet, along an existing Cyclone Fence, to a point; thence bear North 02 degrees, 48 minutes and 52 seconds West along an existing Cyclone Fence for a distance of 77.4 feet to a point; thence bear Northwesterly along an existing Cyclone Fence for a distance of 6.62 feet to a point on the shoreline of the Bay of Florida, said shoreline being a concrete retaining wall; thence meander the shoreline of the Bay of Florida (concrete retaining wall and the natural coral rock shoreline) in a Northeasterly direction to a point which is 250 feet, measured at right angles to the West Property Line of the U. S. Navy and also being westerly from said West Property Line of U. S. Navy; thence bear South 19 degrees and 18 minutes and 40 seconds East for a distance of 388.45 feet to a point on the Northwesterly right-of-way line of Old State Highway No. 4A; thence bear Southwesterly along the Northwesterly right-of-way line of Old State Highway No. 4A for a distance of 491 feet, more or less, back to the point of beginning,

hereinafter referred to as the "mainland portion."

2.   A small Island or Key, known locally as Coral Key, in the Bay of Florida, just north of Gov. Lot 1, Section 9, T.66S., R.32E., on Key Vaca, Monroe County, Florida and being more particularly described by metes and bounds as follows: Commencing at the intersection of the West Line of Gov. Lot 1, Section 9, T.66S., R.32E., and the centerline of U. S. Highway No. 1, bear North 74 degrees and 23 minutes East along the centerline of U. S. Highway No. 1 for a distance of 1873.46 feet to a point, thence bear North 15 degrees and 37 minutes West for a distance of 285.62 feet to a point; thence bear South 78 degrees and 34 minutes West for a distance of 196.52 feet to a point; thence bear North 36 degrees and 54 minutes West for a distance of 115.77 feet to a point; thence bear North 01 degrees and 04 minutes East for a distance of 153.80 feet to a point; thence bear North 51 degrees and 14 minutes West for a distance of 152 feet, more or less, to a point on the Southeastern extremity of said island or key, said point also to be known as the point of beginning of the island or key hereinafter described; from said point of beginning, bear Northwesterly, meandering the shoreline of said island or key for a distance of 140 feet, more or less, to a point; thence meander in a Northeasterly direction for a distance of 100 feet, more or less to a point; thence meander in a Southerly direction for a distance of 150 feet, more or less, back to the point of beginning, containing 0.3 acres, more or less,

a small offshore island (now connected with the "mainland portion") hereinafter referred to as "the Coral Key Portion."

Plaintiffs contend that this property is not homestead (and therefore should pass in fee simple to the widow under the terms of the decedent's will) because — (1) Clark did not maintain a bona fide residence on the property so as to effect a compliance with Florida law relating to homestead; (2) Clark never acquired title to the Coral Key portion prior to his death; and (3) Charlotte Clark individually holds title to the Coral Key portion in fee simple by virtue of a patent issued to her by the United States Government subsequent to Clark's death.

The defendant children, on the other hand, contend that the property is homestead (and therefore, as a matter of law, vests as a life estate in the widow, with the remainder in fee simple to Clark's lineal descendants) because — (1) Clark maintained a bona fide residence thereon as the head of his household for some two years prior to his death; (2) the United States (the only purportedly adverse claimant to the Coral Key portion during Clark's lifetime) had divested itself of all right, title and interest to such portion in the year 1830, by virtue of an Act of Congress confirming title thereto in one Francisco Ferreira; (3) Clark acquired title to the Coral Key portion by more than seven years adverse possession as against any other possible claimant; (4) even if (2) and (3) were not the case, Clark acquired equitable title to the Coral Key portion by virtue of his perfected right to secure a patent thereto from the United States Government prior to his death; and (5) property held under such equitable title is subject to, and descends under, the Florida homestead laws.

### FINDINGS OF FACT

*Clark's Occupation of the Mainland Portion*

The court finds that in May 1948, Harold A. Clark acquired the mainland portion under warranty deed from his first wife, Mildred Clark, and thereafter occupied said portion during the balance of his lifetime.

*Clark's Occupation of the Coral Key Portion*

The evidence shows, and the court finds, that in 1938 Clark placed a number of valuable improvements on the Coral Key portion, consisting of a house, garage, swimming pool and boat dock. Clark also filled in a portion of the beach so as to form a causeway from the mainland to Coral Key. During the years of his occu-

pancy, Clark was assessed for, and paid, all applicable real estate taxes on both the mainland portion and Coral Key portion of the property.

### Residence of Harold A. Clark

The evidence shows, and the court finds, that Harold A. Clark maintained continuous bona fide permanent residence as the head of his household on the property from February, 1953 until his death on said property on December 31, 1954. This finding is based on the uncontradicted testimony of Charlotte Clark, adduced at the hearing held before this court on July 19, 1956, that in February, 1953, Harold A. Clark moved his entire household from their previous residence in North Bay Village, Dade County, Florida, to the house on the Coral Key portion, and lived there continuously until his death. He is, as a matter of fact, buried on the mainland of the property.

### Scope of the Original Patent to the Property

On May 16, 1899, the United States Government issued a patent purporting to convey certain lands to one Francisco Ferreira, a qualified Spanish Land Grant claimant. The patent specifically embraced the mainland portion, but was silent as to Coral Key. This finding is based on the court's examination of defendant's exhibit "F" consisting of a certified copy of this patent, together with the map attached thereto, which has been made an integral part thereof.

### Legal Description of Coral Key

Coral Key was not given any official legal description prior to 1954. In fact, it was not recognized up to that time by any official survey, the latest such survey being the one made in 1874 by the United States Government.

In 1954 the United States Government re-surveyed the area, and, for the first time, officially established the legal description of Coral Key as — "Government Lot 5, Section 9, Township 66 South, Range 33 East, Tallahassee meridian." The United States Government Land Office then took the position that Coral Key was a part of the public lands of the United States. As will be seen later, this position is inconsistent with earlier declarations of the United States Government, and is inconsistent with the facts.

### Clark's Negotiations With the Land Office

Thereafter, Clark entered into negotiations with the United States Government for the lease and ultimate purchase of the Coral Key portion pursuant to the Act of Congress, approved June 1, 1938, 43 U.S.C. 682 (a) (52 Stat. 609), entitled "An Act to Provide for the Purchase of Public Lands for Home and Other Sites," as amended. These negotiations continued until Clark's death in December of 1954. This court finds, from the evidence, that these negotiations did not constitute an acquiescence by Clark to the Government's claim of title, but merely offered a potentially less troublesome way of acquiring clear title to the Coral Key portion than legally contesting the Government's 1954 position.

### Patent to Charlotte Clark

After Clark's death, his widow, Charlotte Clark, continued the pending negotiations instituted by Clark and, on May 8, 1956, secured a patent in her name purporting to convey title to Coral Key from the United States Government to herself. The Court further finds that Charlotte Clark paid the sum of $2,775 to the United States Government for this patent.

### Scope of the Francisco Ferreira Grant

The court finds, as a fact, that the claim of Francisco Ferreira and its subsequent confirmation by Act of Congress in 1830 embraced the Coral Key portion and that the United States was thereby and forever thereafter divested of title thereto. This finding is crucial in this case, because it determines that, in 1938, title to the Coral Key portion was vested in the successors to Ferreira rather than in the United States. Therefore it limits the period of adverse possession necessary for Clark to have acquired title to the Coral Key portion to seven years.

Because of its importance, we will set forth the basis for this finding in some detail.

The court must take judicial notice of the Treaty of Amity, Settlement, and Limits (8 Stat. 252) entered into between the United States and Spain on February 19, 1821 which ceded, inter alia, the Florida Keys from Spain to the United States. Article 8 of this treaty specifically provides that all grants of land made by the King of Spain to private individuals before January 24, 1818, be — " . . . ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid if

the territories had remained under the dominion of his Catholic Majesty."

The court further takes judicial notice of the Act of Congress passed on May 26, 1830 entitled "An Act to Provide for the Final Settlement of Land Claims in Florida" (4 Stat. 405) which confirmed those claims "filed before the register and receiver" that were recommended by the Land Office for confirmation and later referred to Congress through the Secretary of the Treasury.

Certified copies of the records of the United States Land Office (defendants' exhibit "E") show that one portion of the property claimed by Francisco Ferreira was, (to quote the claim itself) — " . . . a key situated among those called the Florida Keys, and is known by the name of Key Bacas, and also four small islands which are situated in the vicinity thereof . . . "

Again referring to defendants' exhibit "E" it is clear that in 1898 the United States Surveyor General conducted an exhaustive inquiry to establish the precise description of the property embraced by the phrase "Key Bacas, and also four small islands which are situated in the vicinity thereof" as such phrase was employed in the Ferreira claim. The Surveyor General's findings and conclusions are very fully set forth in the letter written by him on July 19, 1898 (a portion of defendants' exhibit "E") to the Commissioner of the General Land Office. The court deems this letter to be most persuasive and constitutes evidence to be accorded the greatest weight. In particular, the court finds that the surveyor ascertained the following —

1. According to maps and charts contemporary with the filing of the Ferreira claim, Key Bacas, (or Key Vaccas or Key Vacas, as it was variously called) was in the surveyor's words, " . . . to have been recognized at that date as a *range* of keys, beginning with Knight's Key on the west and extending to Duck Key on the east."

2. Sailing directions published in 1806 referred to Key Bacas as "Cayo Vaccas, or *rather the thick range of islands that go by that name*, extend about N. E. by E. for the space of five leagues, the easternmost of which islands is called 'Duck Key'." (Emphasis added.)

3. A progress sketch from the report of the U. S. Coast Survey for 1851 shows Key Vaccas to embrace a number of islands extending from Knight's Key on the west to Duck Key on the east. (The court notes and finds that Coral Key lies between these limits, as may be seen from the maps attached to defendants' exhibit "F".)

4. The keys embraced by the Ferreira grant and claim constitute an aggregate area of 4,135.05 acres which is within one league square, as specified in the Act of Congress.

Further corroborating evidence appears from the Department of Interior inter-office memorandum written by S. N. Williams dated January 4, 1897, (also included as part of defendants' exhibit "E") which shows that at that time the United States Government recognized that — " . . . all the lands contained in fractional Townships 66 S. R. 32 E. . . . are embraced within the limits of the private claim of Francisco Ferreira."

The Coral Key portion of the property is specifically described by the 1954 Government Survey as being a portion of fractional township 66 south, range 32 east.

Finally, it appears from defendants' exhibit "E" that as recently as July 11, 1946, the Assistant Commissioner of the General Land Office, United States Department of the Interior, stated in connection with Hog Key (another island not shown on the 1874 Survey but lying within township 66 in close proximity to Coral Key) —

"The Ferreira claim is No. 13 in Abstract 15 of the report of the Register and Receiver of the land office at St. Augustine of January 20, 1829, referred to Congress January 14, 1830 (American State Papers, Gales and Seaton Edition, Vol. 6, page 120) and the claim was confirmed by the act of May 26, 1830 (4 Stat. 405). The report of the Register and Receiver before mentioned, described the land embraced in the claim only as 'Key Bacas', but *the grant has been interpreted to embrace all the lands in that particular area...*

"No reason now appears why this interpretation should be questioned and the island to which you refer is, therefore, *not considered to be public land* and is not subject to entry or other disposition under the public land laws." (Emphasis added.)

In view of the foregoing evidence the court finds, as an inescapable fact, that the Francisco Ferreira claim and grant embraced both the mainland portion and the Coral Key portion of the Clark property.

### CONCLUSIONS OF LAW

*Title to Coral Key by Clark's Adverse Possession*

Title to the lands covered by the Ferreira claim and grant was divested from the United States Government and confirmed to Ferreira by the Act of Congress of 1830 (4 Stat. 405) and not by

any subsequent patent. Therefore, the description of lands so conveyed must be and is governed by the grant and claim and not by such patent. As stated by the Supreme Court of the United States in Langdeau v. Hanes, 21 Wall. (88 U. S.) 521, 22 L. Ed. 606 (1875), in a case factually almost identical to that at bar —

"In the legislation of Congress a patent has a double operation. It is a conveyance by the government when the government has any interest to convey, but where it is issued upon the confirmation of a claim of a previously existing title it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities respecting the claim as justify its recognition and confirmation. . . .

"In the present case the patent would have been of great value to the claimants as record evidence of the ancient possession and title of their ancestor and of the recognition and confirmation by the United States, and would have obviated in any controversies at law respecting the land the necessity of other proof, and would thus have been to them an instrument of quiet and security. *But it would have added nothing to the force of the confirmation.* The survey required for the patent was only to secure certainty of description in the instrument, and to inform the government of the quantity reserved to private parties. . . . *A legislative confirmation of a claim to land is a recognition of the validity of such claim, and operates as effectually as a grant or quitclaim from the government.* . . . Here, in any view that may be taken, the title *was perfected in the heirs of Tongas more than half a century before the patent issued,* and for more than thirty years of that period the landlord of the defendant has been in the actual possession of the premises under claim and color of title made in good faith, and has during that time paid all the taxes legally assessed thereon. His possession has, therefore, ripened into a title, which under the Statute of Illinois, is a bar to any adverse claim." (Emphasis added.)

To the same effect, see United States v. Stockslager, 120 U. S. 470, 32 L. Ed. 785, 9 Sup. Ct. 383 (1889) ; Del Pozo y Marcos v. Wilson Cypress Company, 269 U. S. 83, 70 L. Ed. 172, 46 Sup. Ct. 57 (1925) ; Work v. Mason, 6 F. 2d 474 (D. C. App. 1925) ; Dugas v. Powell, 228 La. 748, 84 So. 2d 177 (1955).

Since this court has found, as a matter of fact, that the Coral Key portion of the Clark property was embraced in the lands claimed by Ferreira and confirmed to him by Congress, it inevitably follows

that the United States has had no right, title, or interest thereto since May 26, 1830. The attempt on the part of the United States to make a further conveyance in 1956 was and is a nullity.

It further follows that, under the laws of Florida, Harold Clark acquired title in fee simple to the Coral Key portion by virtue of more than seven years adverse and hostile possession as against all persons whose title deraigned through or from the Ferreira grant. Whether Clark's possession was under color of title or otherwise is a point which we do not deem necessary to decide under the facts of this case.

### Clark's Equitable Title to Coral Key

1. Even if the foregoing was not so, as a matter of law by virtue of his negotiations with the United States Government Clark acquired prior to his death a *right superior to all others* to have legal title to Coral Key transferred from the United States to himself, which right constituted, as a matter of law, a clear equitable title.

Clark's right of priority is apparent from an examination of Department of Interior Bulletin 61417 (defendants' exhibit "B") wherein the land was offered for sale subject to " . . . prior existing valid settlement rights and preference rights conferred by existing laws or equitable claims subject to allowance and confirmation."

This conclusion is strengthened by positive evidence (the Land Management Report, dated May 17, 1955, page 20 of defendants' exhibit "A") that the Bureau of Land Management recognized the Clark claim and settlement rights, and thus classified the land as subject to application and sale directly to the heirs of Clark (not to Charlotte Clark, individually) under the Small Tract Act, rather than following its customary procedure of offering the land for public sale under the provisions of 43 U.S.C. 1171 (28 Stat. 687, as amended) relating to the sale of isolated tracts.

It is perfectly obvious from the testimony of Ralph E. Cunningham adduced at the July 19, 1956 hearing, considered in conjunction with the aforesaid Land Management Report that, had Clark lived, the Land Office would have issued him a patent to the Coral Key portion almost as a matter of course.

Furthermore from an examination of the correspondence between Clark's attorney and the Land Office (see defendants' exhibit "A") it is apparent that the prerequisites to lease and sale under the Small Tract Act were in every way fulfilled by Clark to the extent that a refusal on the part of the Land Office to issue a patent to Clark would have constituted such a gross abuse of ad-

ministrative discretion that Clark, by pursuit of his administrative and judicial remedies, could have compelled the Land Office to issue him a patent.

2. It is well-settled law that equitable title to real property vests in one (such as Clark) who has the right to have full title transferred to him upon the performance of specified conditions. As stated in State ex rel. City of St. Louis v. Baumann, 348 Mo. 164, 153 S.W. 2nd 31 (1941) — "An equitable title has been described as the right in the party to whom it belongs to have the legal title transferred to him upon the performance of specified conditions."

See also Karalis v. Agnew, 111 Minn. 522, 127 N.W. 440 (1910) — "An equitable title is a right possessed by a person to have the legal title to property transferred to him upon the performance of specified conditions."

Further support of this conclusion of law may be found in Call v. Richfield Oil Corp., 101 F. Supp. 972 (S.D. Cal. 1951), wherein the court said — "From the very beginning this government has followed a consistent policy relative to its public lands. Regardless of the phase of endeavor, the policy has always been the same. It can be stated thus: the first comer (or the first locator) obtains a right prior to all subsequent comers or locators."

3. The interest which Harold Clark had thus acquired prior to his death therefore constituted a clear equitable title in and to the property.

### Title to the Mainland Property

Since there is absolutely no question that Francisco Ferreira acquired title to the mainland property by virtue of the aforesaid Act of Congress of 1830 confirming his claim (further evidenced by the patent issued to him on May 16, 1899) it was through this confirmation and patent of record that Clark derived undisputable fee simple title to the mainland property through successive grantees (the latest being his first wife) as appears from the public records of Monroe County, Florida. Plaintiffs, it is to be noted, do not controvert this.

### Homestead Character of Property

1. Real property held under equitable title is subject to the law relating to homestead to the same extent and the same manner as property held in fee simple. See Morgan v. Bailey, 90 Fla. 47, 105 So. 143 (1925); Bessemer Properties, Inc. v. Gamble, 158 Fla. 38,

27 So. 2d 832 (1946) ; Beall v. Pinkney, 150 F. 2d 467 (5th Cir. 1945) ; Radford v. Kachman, 27 Ohio App. 86, 160 N.E. 875 (1927) ; Keith v. Albrecht, 89 Minn. 247, 94 N.W. 677 (1903).

2.   Since the evidence shows that Clark resided on the property as the head of his household for almost two years prior to his death, and, in fact, died and was buried on the property, the court concludes that the property constitutes homestead and that Charlotte Clark, as the surviving widow, is thus entitled, as a matter of law, only to a life estate therein with a vested remainder in fee simple absolute to the Clark children.

## Rights and Duties of Widow as Constructive Trustee

Inasmuch as all of the dealings with the Land Office concerning the Coral Key portion were with Clark, and it was he rather than Mrs. Clark who was in possession of the property, placed improvements thereon, and thereby acquired valid settlement rights and equitable title, the patent issued by the Land Office should have been in Clark's name. Hence, it is clearly inequitable for Mrs. Clark to acquire fee simple title to the property as against the homestead rights of Clark's children, and, under well-settled principles of equity, the property is therefore impressed with a constructive trust in her name as to such rights, for the use and benefit of the Clark children.

As stated by the Supreme Court of Florida in Anglin v. Lauderdale-By-The-Sea, 60 So. 2d, 619 (1952) — "Constructive or resulting trusts are recognized when it is equitable or just to do so to prevent a fraud or unjust enrichment . . . "

Again, in Tillman v. Pitt Cole Company, 82 So. 2d 672, (Fla. 1955), the court said — "Equity will raise a constructive trust where one through fraud, abuse of confidence or other questionable means acquires property which in equity and good conscience he should not be permitted to hold."

See also Citizens' State Bank v. Jones, 100 Fla. 1492, 131 So. 369 (1930) ; Quinn v. Phipps, 93 Fla. 805, 113 So. 419 (1927) ; Forrester v. Watts, 73 Fla. 514, 74 So. 519 (1917) ; Doing v. Riley, 176 F. 2d 449 (5th Cir. 1949).

This is a decisive conclusion of law in that it governs the legal effect of the patent issued to Charlotte Clark by the United States Land Office.

If, as it appears, Mrs. Clark paid $2,775 from her own funds to the United States Government for issue of the patent in her name

she is entitled to receive reimbursement in a like amount from the Clark estate.

### FINAL DECREE

It is therefore ordered, adjudged and decreed that —

a)  The two contiguous parcels of land hereinabove described which are the subject matter of this suit are hereby found and decreed to be the homestead of the decedent, Harold A. Clark, under the laws of this state, and to be subject thereto.

b)  Charlotte Clark, as the surviving widow, shall, therefore, take and hold a life estate in said property, and the children of Harold A. Clark, deceased, to-wit: Pamela Clark Gardner, Stevenson Clark, and Harold A. Clark, Jr., shall take and hold a vested remainder in fee simple absolute, share and share alike.

c)  The estate of Harold A. Clark is hereby decreed to be indebted to Charlotte Clark in the sum of $2,775 and the plaintiffs are directed to reflect this indebtedness in the probate proceedings presently pending as to the estate of Harold A. Clark, and to arrange for its payment prior to making distribution of other assets of the estate.

d)  Costs herein are taxed against the plaintiffs.