WALDEN, Judge
(dissenting):
Appellant was convicted and sentenced for attempted possession of heroin. I would reverse and remand. There was no probable cause to make the arrest in question. The ensuing search and seizure was illegal and the seized contraband should have been suppressed at trial.
The appellate issue is simply whether the police officers had probable cause to arrest.
The rule is well known and variously stated in a number of Florida cases. Probable cause exists where the facts or their reasonable inferences would lead a reasonable person to conclude there were good grounds to believe that the law was (or is) being violated. See Beck v. State, Fla.App.1966, 181 So.2d 659; Paula v. State, Fla.App.1966, 188 So.2d 388. In State v. Profera, Fla. App.1970, 239 So.2d 867, we stated “. . . the law in Florida is that probable cause to arrest exists where a reasonable man, having the specialized training of a police officer, and reviewing the facts known to the arresting officer prior to the actual time of arrest, would come to the conclusion that a felony is being, or has been, committed by the person to be arrested. [Citations omitted.]” There are numerous Florida cases to the same effect. See, e. g., Walker v. State, Fla.App.1967, *537 196 So.2d 8; State v. Doherty, Fla.App.1970, 240 So.2d 332; Trivette v. State, Fla.App.1971, 244 So.2d 173; Russell v. State, Fla.App.1972, 266 So.2d 92. Probable cause cannot be a “mere suspicion” nor can suspicion be substituted for known facts. See Staples v. United States, 5th Cir. 1963, 320 F.2d 817; Kraemer v. State, Fla.1952, 60 So.2d 615; dissent in State v. Miller, Fla.App.1972, 267 So.2d 352; and Kersey v. State, Fla.1952, 58 So.2d 155. The police must know facts which would cause a reasonable man to believe an offense was being committed. Bryant v. State, Fla.App.1963, 155 So.2d 396.
We now turn to the facts which are really not in dispute: On September 10, 1971, Sergeants Matthews and Martin went to the Dixie Court Hotel in response to a call from the clerk who was on duty. Upon their arrival, the officers spoke to the clerk who informed them that there had been a lot of phone calls to Room 717, and a lot of people coming from and going to that room at all hours of the day and night. The officers did not ascertain how many calls or visitors the clerk considered to be “a lot”, in terms of actual numbers, although it is evident that there was a sufficient amount of activity in this respect for the clerk to consider it quite unusual. She also informed the officers that she had overheard while on the switchboard a conversation between one of the occupants of the room and a caller whereby a rendezvous in the hotel parking lot was arranged for some purpose. Although the officers testified that the clerk’s primary interest in asking for police aid was due to the fact that she had a concern with the possibility of the occupants “beating their bill”, both officers testified that, after learning of this unusual activity, they immediately recognized it as one of the indicia of traffic in some illicit activity. The officers decided to wait for the caller to arrive, a description of whom had been furnished by the desk clerk. Shortly thereafter a black male fitting the description given by the clerk arrived at the hotel with a baby in his arms. The officers followed him into the hotel lobby where they heard the clerk ask him where he was going and his response to the effect that he was going to Room 717 where he lived. The clerk said words to the effect, “no, you don’t live there”, and refused to permit this caller (later identified as co-defendant Harper) to go upstairs. Harper then went to a house phone and placed a call to Room 717 and Officer Martin, who had positioned himself near the telephone, heard Harper say something to the effect, “four is not enough, I need ten”. Thereafter, Harper paced the lobby in a nervous and impatient manner, the officers describing his appearance as sweaty, in spite of the fact that the lobby was air conditioned. One, or both, of the officers testified that, based upon their experience, they felt that from Harper’s appearance and demeanor he was a drug addict. After Harper had been in the hotel lobby some 15 to 30 minutes (various estimates of the time were given) he placed another call on the house phone saying something to the effect, “What is keeping you, what is the delay”. Shortly thereafter, appellant-Hardy entered the hotel lobby from the elevator, carrying in his hand some yellow object, which neither of the officers could further identify. Hardy and Harper went from the hotel lobby into the adjoining coffee shop where they sat on adjoining stools at the counter facing each other. Officer Martin kept these two men under surveillance and after Harper and Hardy had been seated in the coffee shop for a matter of two or three minutes, the officer observed Hardy pass a yellow object to Harper, who placed it in his right hip pocket. The officer did not know what was passed. Almost immediately after the transaction occurred, Harper and Hardy each left the coffee shop by different routes and each was stopped outside of the hotel and arrested for violation of the narcotics laws.
It is my view that however the above facts are assessed and assayed — whether singly, totally, or in any special combination *538 —the judicial answer is always the same. There may have been and was suspicion. However, there were no facts and evidence sufficient to lead a reasonable man into believing that a law was being violated. Thus, probable cause did not exist upon which to base the arrest, search and seizure.
As stated, I would reverse and remand.