310 So.2d 12 (1975)
Joseph D'AGOSTINO, Petitioner,
v.
STATE of Florida, Respondent.
No. 45608.
Supreme Court of Florida.
February 28, 1975.
Rehearing Denied April 17, 1975.
*13 Ray Sandstrom, of Sandstrom & Hodge, Fort Lauderdale, for petitioner.
Robert L. Shevin, Atty. Gen., and Frank B. Kessler, Asst. Atty. Gen., for respondent.
PER CURIAM.
We have for review by way of conflict certiorari, a denial of a motion to suppress certain evidence. The plea entered before the trial court was nolo contendere upon an express reservation to appeal the ruling of the trial judge which denied petitioner's motion to suppress. The denial was affirmed by the Fourth District Court of Appeal at 293 So.2d 803. This motion and the court's rulings constitute "record proper" which initially affords a basis for our jurisdiction, if conflict therefrom appears, whereupon the entire cause and testimony may be examined. Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965). Having acquired jurisdiction, we proceed to consider the cause on the merits. Brown v. State, 206 So.2d 377 (Fla. 1968).
Our review reveals that there was no probable cause for the search and seizure under the circumstances in this case, so that the motion to suppress should have been granted, presenting conflict on the ruling as a basis for our jurisdiction.[1]
The State admits "mass confusion" and excitement at the scene of the arrest after a guest of a hotel returned to her room from the pool and telephoned the hotel operator that "we had been robbed ..., get the police" with nothing more and no mention of what room she occupied. The hotel operator then proceeded to call the police whose dispatcher issued a "Be On The Lookout For" (BOLO).
One patrolman testified that the "BOLO" was related to a burglary in process at the hotel and that a white male was being chased by a white female and a Negro *14 male. Another patrolman's testimony of the BOLO was that a white male was being pursued by a woman who had on a leopard skin type robe in the parking lot of the hotel.
The hotel guest, Mrs. Overholt, who had called from her room, "could not describe the burglar". She was the only possible witness who could identify the person she saw leaving her room when she entered and who was seen only to the extent of "bare legs, and white socks and shoes". Mrs. Overholt could not describe the person further and was uncertain as to whether the person exiting had on shorts or a skirt. After a glimpse of her room which revealed an open nightcase, Mrs. Overholt proceeded through the door and looked around but saw no one. She then yelled to some maids and a Mr. Brown on the second balcony. Mr. Brown informed her of the direction taken by a man who had passed him up on the second floor corridor. Mrs. Overholt proceeded back to the pool area to inform her husband and friends, the Nordlings.
Petitioner had been proceeding beneath the 17th Street Causeway to the parking lot of a nearby motel when Mrs. Nordling engaged the aid of some construction workers and caused the petitioner to remain in that parking lot. Mr. Nordling arrived on his bicycle and shortly thereafter so did Mrs. Overholt and Mr. Brown, followed closely by the police. Mrs. Nordling testified that petitioner was searched first and then placed in the first police unit at the scene; Mrs. Overholt corroborated this testimony, although Patrolman John Corbly testified that he only placed petitioner under arrest without searching him and placed him in the police unit at the scene.
The State's case consisted of the testimony of the two patrolmen that Mrs. Nordling stated, "This man just robbed my room" and "that she was missing a quantity of jewelry from her room and some kind of jewelry bag." Mrs. Nordling testified, however, that she had no idea her room has been "robbed" and expressed great surprise at seeing her jewels removed from the petitioner when he was searched by the police at the scene. It was Mrs. Overholt and not Mrs. Nordling who had reported a robbery, but had only seen "bare legs, and white socks and shoes" depart her room and she had never described the person to Mrs. Nordling who testified that she was unaware her room had been broken into and did not know any jewelry had been taken, and further, that she at no time made any such statement to the police. Mrs. Overholt's additional testimony was that one of the officers was already searching petitioner at the scene as the others were still attempting to find witnesses to the occurrence.
The hotel resident "victim" was unable to describe the suspect except for "bare legs, and white socks and shoes". The witness Mr. Brown, who seemed to be the relay between the volunteer Mrs. Nordling in the "pursuit" and the victim, did not talk to anyone until after petitioner had already been arrested and the search had been made, and thus we seem to have an insufficient basis for identity and, therefore, for the arrest and search herein.
Testimony conclusively established that the police talked to no one before arresting and searching the petitioner and accordingly could only have acted upon the general BOLO alert for someone. Their statements as to identification were explicitly denied by Mrs. Nordling to whom they were attributed.
The patrolman who subsequently arrived said he arrested petitioner and then searched him. All the other witnesses testified that the patrolman first searched petitioner, found certain items of jewelry and then placed him in the police car. If petitioner were searched first, as all of the witnesses save the patrolmen testified, then such a search and seizure prior to an arrest violates the constitutional principles of a proper search and seizure, and it is for *15 this reason that the motion to suppress should have been granted. This is a further basis for conflict.[2] Officers cannot search first for incriminating evidence and then base an arrest and conviction upon such illegal search and seizure.[3]
If in fact an arrest was actually first made, the question further arises as to whether there was probable cause for it. No one at the scene expressly identified petitioner as a burglar. Patrolman Corbly testified that Mrs. Nordling so stated, but she denied this and stated that she was actually surprised when the search was made which revealed some items of jewelry. No warrant had, of course, been issued. There was no indication that petitioner was "escaping" or about to destroy any items of property as a basis for an arrest. The police had only received a "Be On The Lookout" notice. The excitement at the scene may well have been sufficient to excite the officers into searching the petitioner, but this renders it nonetheless improper if there was not probable cause prior to the search.
The probable cause required for a warrantless arrest has been compared to a magistrate's assessment of "probable cause" for a search or arrest warrant to issue. Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) rejected application of any lesser standard by a court reviewing a police assessment at the scene of probable cause for such a warrantless arrest as here. Whiteley also involved an arrest by an officer acting on a BOLO and reiterated the necessity of facts in the officer's possession to support the probable cause necessary for making the arrest and then the search. See Collins v. State, supra.
It is settled that in order to make a valid arrest probable cause must exist prior thereto.[4] Moreover, a BOLO alert does not in and of itself constitute adequate probable cause for an arrest, absent some supporting factual data in the possession of the arresting officer prior to making the arrest, which would support a finding of probable cause. See Whiteley v. Warden, supra. Clearly the information in the BOLO did not contain sufficient and actual data as the basis for probable cause for making an arrest or search. The arresting officer must be possessed of information prior to the arrest which would constitute the required probable cause to justify the arrest being made.[5] It is plain that the facts within the possession of the officers here were not sufficient as a matter of law to constitute probable cause for arrest and, of course, the subsequently discovered stolen jewelry after an illegal arrest will not supply the missing factual data which was not in hand prior thereto,[6] for it becomes the axiomatic "fruit of the poisonous tree" of such search[7] and requires the granting of a motion to suppress such evidence which the trial judge here failed to do. The witnesses here all testified that the search preceded the arrest and also stated that none of them had talked with the police prior to such arrest and search of the petitioner.
It is noteworthy that we do not have here a continuous pursuit which in the first place would give logic and reason to *16 the identity of petitioner as being related to the "legs, and white socks and shoes" which is all that was seen of the person departing Mrs. Overholt's room at an earlier time.[8] All this is too flimsy upon which a sentence of ten years' imprisonment of this petitioner could possibly stand. To allow it would permit a game of "blind man's bluff" and if the person caught turns out to have stolen property, then, contrary to all legal principles, this could be allowed to relate back as a reason for the arrest and search. To be sure, discovery here of apparently stolen goods upon a search would make it appear that some crime had perhaps been committed, but it would also lay a dangerous predicate for the arrest, search and seizure of innocent citizens which our Constitution and laws have jealously guarded through the years. Such a "hit and miss" approach to arrests cannot be permitted. Kraemer, supra; Russell, supra.
The denial of the motion to suppress in this cause, which was expressly reserved for review on appeal, was improper under the circumstances and accordingly the decision of the District Court affirming such erroneous action is quashed with instructions to remand the cause to the trial court for dismissal of the charge.
It is so ordered.
ADKINS, C.J., and ROBERTS, BOYD, McCAIN, DEKLE and ERVIN (Retired), JJ., concur.
OVERTON, J., dissents.
NOTES
[1] Fla. Const. Art. V § 3(b)(3); Kraemer v. State, 60 So.2d 615 (Fla. 1952); Russell v. State, 266 So.2d 92 (Fla.App.3d 1972); Beck v. State, 181 So.2d 659 (Fla.App.2d 1966); Richardson v. State, 291 So.2d 253 (Fla.App. 1st 1974).
[2] Herring v. State, 121 So.2d 807 (Fla.App.3d 1960); Collins v. State, 65 So.2d 61 (Fla. 1953); Godbee v. State, 224 So.2d 441 (Fla. App.2d 1969); Richardson v. State, supra.
[3] Kraemer v. State, supra; Richardson v. State, supra.
[4] Fla. Stat. § 901.15, Russell v. State, supra; Beck v. State, supra.
[5] Boynton v. State, 64 So.2d 536 (Fla. 1953).
[6] Kraemer v. State, supra; Richardson v. State, supra.
[7] Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426 (1920); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); French v. State, 198 So.2d 668 (Fla.App.3d 1967). See Pitler, "The Fruit of The Poisonous Tree" Revisited and Shepardized, 56 Cal. L.Rev. 579 (1968).
[8] Fla. Stat. § 901.15.