Robert **FAVRE**, Plaintiff-Appellee,

v.

C. Murray **HENDERSON**, Warden, Louisiana State Penitentiary, Defendant-Appellant.

No. 71–3294.

United States Court of Appeals, Fifth Circuit.

June 13, 1972.

Rehearing Denied June 29, 1972.

Certiorari Denied Oct. 16, 1972. See 93 S.Ct. 235.

Clark, Circuit Judge, dissented and filed opinion.

William J. Guste, Jr., Atty. Gen., Baton Rouge, La., Louise Korns, Asst. Dist. Atty., City of New Orleans, New Orleans, La., Jim Garrison, Dist. Atty., for the Parish of Orleans.

Jack C. Benjamin, New Orleans, La., for plaintiff-appellee.

Before WISDOM, GOLDBERG and CLARK, Circuit Judges.

WISDOM, Circuit Judge:

The State of Louisiana appeals from District Judge Alvin B. Rubin's judgment granting Robert Favre's application for a writ of habeas corpus. The district court determined that the admission of certain testimony at Favre's state court trial denied Favre his right to be confronted with the witnesses against him and that the admission of the testimony was not harmless error. We affirm.

I.

Robert Favre and Walter Holley were jointly charged in Louisiana state court by bill of information with armed robbery. See LSA–R.S. 14:64. Before the trial, Holley escaped. Favre was tried separately convicted and sentenced as a multiple offender to forty years at hard labor in the Louisiana State Penitentiary. The conviction was affirmed on appeal by the Supreme Court of Louisiana with one justice dissenting. State v. Favre, 255 La. 690, 232 So.2d 479 (La. S.Ct.1970).

Favre filed an application for a writ of habeas corpus in the United States District Court for the Eastern District of Louisiana. He alleged that he had been denied the right to be confronted with the witnesses against him in violation of his Sixth and Fourteenth Amendment rights. Favre challenged the admission of certain testimony at his state court trial.

The nature of the case requires extensive quotation of testimony from the record.[1] The State had called to the stand an officer of the New Orleans Police Department who had arrested Favre on December 6, 1966.

[Mr. Alford, the prosecuting attorney, questioned the police officer.]

"Q. Officer, had you had occasion to investigate as of December 1, 1966, an armed robbery which occurred at 800 France Street?

"A. I didn't participate at the original investigation at the scene, we were conducting a follow-up investigation of that armed robbery.

---

1. The relevant testimony is reproduced fully in the opinion of the Louisiana Supreme Court. 232 So.2d at 480–482.

"Q. Now did you have any information.

\* \* \* \* \* \*

[Defense counsel objects, and the objection is overruled.]

"Q. Did you as of December 1, 1966, have in your possession any information relative to any of the facets of this particular case?

"A. Yes, sir.

[Defense counsel objects and asks for a mistrial. The objection is overruled and the mistrial refused.]

"Q. Now I am not interested in anything that anyone may or may not have told you. However, I do ask you what was the source of the information which you had at that time?

"A. Originally?

"Q. Yes.

"A. From a confidential informant.

[Defense counsel objects, and the objection is overruled.]

"Q. As of December 1, 1966, did you know or were you seeking the arrest of any particular person for the armed robbery of 800 France Street?

[Defense counsel objects, and the objection is overruled.]

"Q. Could you answer the question, please, officer?

"A. Yes, sir.

"Q. Whom were you seeking?

"A. The defendant, Robert Favre, as well as the second subject, Walter Holly.

"Q. And some of your information was received from a confidential informer?

"A. Yes.

"Q. Was it one confidential informant, two confidential informants, three \* \* \*

[Defense counsel objects, and asks for a mistrial. The objection is overruled and the mistrial refused.]

"Q. Would you answer the question, please?

"A. Yes, sir. There were two separate informants.

"Q. Did you know these informants?

"A. Yes, sir.

"Q. Had they ever given you any information in the past?

"A. Yes, sir.

[Defense counsel objects, and the objection is overruled.]

"Q. Had the information which you had previously received from these informants been reliable?

"A. Yes.

[Defense counsel objects, and the objection is overruled.]

"Q. Now has the information which you have received from these informants in the past resulted in the convictions of persons?

"A. Yes, sir."

The district court, finding that Favre had exhausted available state remedies, granted the application for habeas relief. The district court stated:

While the State Police Officer did not relate the words his informants had used, he clearly conveyed by implication that they had told him something to incriminate Favre. He was seeking to arrest Favre because of information received from "two separate informants;" "the information which [he] had previously received from these informants [had] been reliable;" and had "in the past resulted in the conviction of persons."

This was testimony that inevitably implanted in the jury's mind the idea that informants who had previously given information that led to the conviction of other persons provided information about Favre that caused the police to put him under surveillance and later to arrest him. The only reasonable inference to be drawn from the police officer's testimony was that the informers had some reason to believe Favre guilty. These informants thus served as out-of-court declarants against the defendant. . . .

[T]here was no opportunity for the defendant to cross-examine accusers whose statements were instrumental in securing a conviction. . . . Favre of course had no chance to cross-examine the police officer's informants, and was never confronted with them.

Favre v. Henderson, E.D.La.1970, 318 F.Supp. 1384, 1385–86.

On appeal by the State, this Court "vacate[d] the judgment of the district court and remand[ed] the cause to the district court for a determination of whether the admission of this evidence deprived the defendant of a trial that was fundamentally fair or whether the admission of this evidence,.although erroneous, was merely cumulative and harmless". Favre v. Henderson, 5 Cir. 1971, 444 F.2d 127, 128.

On remand, the district court held that the admission of the disputed testimony was not harmless error and that it deprived Favre of a fair trial. The State has, once again, appealed.

## II.

The disputed testimony was relevant in two distinct, but related, ways. When read in context, the testimony of the police officer served, first, to bolster the identification of Favre as the person who committed the crime charged. In other words, the officer's testimony that information was received from two confidential informers, that these informers had provided reliable information in the past, and that information received from these informers had, in the past, led to convictions, served to establish that Favre was the person who committed the crime. Also, as the district court correctly noted, the testimony served to establish Favre's guilt. The logical inference from the officer's testimony was that the informers had given informa-

tion to the officer that led him to believe that Favre was guilty and led the officer to arrest Favre. This inference was supported by the testimony that "information which [the officer had] received from these informants in the past resulted in the conviction of persons". In short, the jury was led to infer that the informers, who were not identified, were not present in court, and were not subject to cross-examination, believed that Favre was guilty of the crime charged. Inherent in the testimony, which may have been offered only to establish identification, was an assertion by an out-of-court declarant as to guilt. By saying, "Favre committed the crime", the out-of-court declarant said (1) *"Favre* committed the crime" [identification] and, (2) "Favre *committed the crime"* [guilt].

■ Whether offered by the prosecution to establish identification, guilt, or both, the testimony, when considered in light of its logical inferences, is hearsay. "Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." McCormick, Evidence 460 (1954). *See generally* id. pp. 455–712; Wigmore on Evidence §§ 1361–1769 (1940); Wharton, Criminal Evidence pp. 569–765 (1955). Although the officer never testified to the exact statements made to him by the informers, the nature of the statements as discussed above, was readily inferred. The statements were offered to establish the truth of the matters asserted therein —identification, guilt, or both. The truth of the assertions depended upon the credibility of the informers who were not identified, not present in Court, and not subject to cross-examination.[2]

---

2. The testimony was not an assertion as to what the witness heard or saw; it was "proof of fact through extrajudicial statements".

　　The hearsay rule does not prevent a witness from testifying as to what

he has heard; it is rather a restriction on the proof of fact through extrajudicial statements. From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can

## III.

"[T]he Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right . . . made obligatory on the States by the Fourteenth Amendment.[3]

To say that testimony is hearsay is not, however, to say that its admission violates the Confrontation Clause. Nor is the converse true.

> While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. * * * The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied.

Green v. California, 1970, 399 U.S. 149, 155–156, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489, 495–496. *See also* Dutton v. Evans, *supra*, 400 U.S. at 80, 91 S.Ct. at 215, 27 L.Ed.2d 213.[4]

In order to determine that Favre's right of confrontation was violated by the admission in state court of the disputed testimony, we must look to the Supreme Court's thorough treatment of the subject in Dutton v. Evans. The disputed testimony in that case is described in the Supreme Court opinion as follows:

> One of the 20 prosecution witnesses [against Evans] was a man named Shaw. He testified that he and Williams [Evans' co-conspirator] had been fellow prisoners in the federal penitentiary in Atlanta, Georgia, at the time Williams was brought to Gwinnett County to be arraigned on the charges of murdering the police officers. Shaw said that when Williams was returned to the penitentiary from the arraignment, he had asked Williams: "How did you make out in court?" and that Williams had responded, "If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now." Defense counsel objected to the introduction of this testimony upon the ground that it was hearsay and thus violative of Evans' right of confrontation. After the objection was overruled, counsel cross-examined Shaw at length.

400 U.S. at 77, 91 S.Ct. at 214. In holding that the admission of the testimony did not violate Evans's Confrontation Clause right, the Court considered numerous factors including: (1) "[T]he statement contained no express assertion

be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard.
Dutton v. Evans, 1970, 400 U.S. 74, 88, 91 S.Ct. 210, 27 L.Ed.2d 213, 226.

3. Pointer v. Texas, 1965, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923; *see* Dutton v. Evans, *supra*; Bruton v. United States, 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476; Barber v. Page, 1968, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255; Douglas v. Alabama, 1965, 380 U.S. 415, 418–419, 85 S.Ct. 1074, 13 L.Ed.2d 934; Parker v. Gladden, 1966, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420; Holman v. Washington, 5 Cir. 1966, 364 F.2d 618.

4. This Court has recognized the admissibility against an accused of dying declarations, Mattox v. United States, 146 U.S. 140, 151, 13 S.Ct. 50, 53, 36 L.Ed. 917, 921, and of testimony of a deceased witness who has testified at a former trial, Mattox v. United States, 156 U.S. 237, 240–244, 15 S.Ct. 337, 338–340, 39 L.Ed. 409, 410, 411. See also Dowdell v. United States, *supra*, 221 U.S. at 330, 31 S.Ct. at 592, 55 L.Ed. at 457; Kirby v. United States, *supra*, 174 U.S. at 61, 19 S.Ct. at 574, 43 L.Ed. at 896. * * * There are other analogous situations which might not fall within the scope of the constitutional rule requiring confrontation of witnesses.
Pointer v. Texas, *supra*, 380 U.S. at 407, 85 S.Ct. 1065.

about past fact, and consequently it carried on its face a warning to the jury against giving the statement undue weight"; (2) the out-of-court declarant's personal knowledge of the crime and its participants was "abundantly established" by other evidence in the trial, it was "inconceivable" that cross-examination of the out-of-court declarant would have shown a lack of personal knowledge; (3) the possibility that the out-of-court declarant's statement was founded on faulty recollection was "remote in the extreme"; (4) the circumstances under which the out-of-court declarant made the statement "were such as to give reason to suppose that [the out-of-court declarant] . . . did not misrepresent [the defendant's] . . . involvement in the crime". 400 U.S. at 89, 91 S.Ct. at 219. In addition, the Court stated that (5) the evidence was not " 'crucial' or 'devastating' ", 400 U.S. at 87, 91 S.Ct. at 219; (6) there were many other (twenty to be exact) witnesses for the prosecution and defense counsel was given the opportunity to cross-examine all of them, 400 U.S. at 87, 91 S.Ct. at 219; (7) the testimony was admitted under an "exception to the hearsay rule long established under state statutory law", 400 U.S. at 87; (8) an eye-witness "described all the details of the [crime] . . . and . . . was cross-examined at great length", 400 U.S. at 87, 91 S.Ct. at 219; and (9) the out-of-court declarant, or others who could testify that the statement was not made, could have been subpoenaed by the defense, 400 U.S. at 90, fn. 19, 91 S.Ct. 210, 27 L.Ed.2d 213.

■ A consideration of these factors convinces us that in the present case the Confrontation Clause was violated by admission of the disputed testimony. (1) Although the testimony may, by its dubious nature, have carried on its face a warning to the jury against giving it undue weight, it did contain an express assertion as to past fact, i. e., the reliability of the informers, and an implicit assertion about past fact, i. e., identification, guilt, or both. (2) There is absolutely no evidence in the record to establish that the out-of-court declarants had personal knowledge of the crime or its participants, and it is entirely possible that cross-examination of the informers would have shown a lack of personal knowledge or other indications of unreliability. (3) The possibility that the informers' statements were founded on faulty recollection is entirely possible. (4) There is nothing in the record to show the circumstances under which the informers made their statements much less to show that they did not misrepresent Favre's role in the crime. (5) The evidence, as discussed below, is although not "devastating" extremely important if not "crucial". (6) Other witnesses, as discussed below, did not serve to establish a strong case against Favre. (7) The testimony was not admitted under an exception to the hearsay rule. (8) There were eye-witnesses to the crime, but, as discussed below, they were by no means as convincing as the witnesses in Dutton v. Evans. (9) Finally, Favre could not have subpoenaed the informers because their identities were not disclosed and could not have subpoenaed witnesses whose testimony could show that the statement was not made.

The mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement". California v. Green, 399 U.S. at 161, 90 S.Ct. at 1936, 26 L.Ed.2d at 499. Dutton v. Evans, *supra*, 400 U.S. at 89, 91 S.Ct. 210, 27 L.Ed.2d 213. In the present case, testimony was admitted which led to the clear and logical inference that out-of-court declarants believed and said that Favre was guilty of the crime charged. The informers were not identified and were not subject to cross-examination. The trier of fact had absolutely no "satisfactory basis for evaluating the truth of the prior statement".

## IV.

Our prior remand in this case was for the purpose of determining whether the admission of the disputed testimony, although erroneous, was harmless error. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt". Chapman v. California, 1967, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710. *See also* Harrington v. California, 1969, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284. The district court held that the admission of the testimony was not harmless error. We agree.

We quote from the opinion of the district court:

Conviction of the accused rested entirely on his identification by four . . . witnesses who saw the robbery. None of the witnesses claimed to know the accused before the robbery. Each had given a physical description of him to the police. All of them had identified him in a police lineup 15 days after the robbery. Defense counsel had suggested that the lineup was arranged so as to point to the accused by placing him in line with other persons whose physical description manifestly did not fit those the witnesses had given. Thus defense counsel had created some doubt about the validity of the lineup identification.

At the trial, Horace Ruiz, the bar owner, said he could not make a positive identification.[5] He thought the accused was the robber based on the color of his hair and his complexion.[6] He never saw the robber without a handkerchief over his face.[7] Felix Ruiz, Horace's uncle, made a positive identification. But he also testified that the handkerchief obscured the robber's nose and mouth,[8] he never saw the culprit without the mask,[9] and he remembered no identifying marks.[10] Andrew P. Alfonso made an identification but he "couldn't see his face completely to make a real positive identification . . ."[11] He based the identification on general physical build and hair.[12]

5. Q. Now then in accord with your conscience and before your God, son, you can't say that in all truthfulness, positively that the man behind that man was not one or more, was not one of those men that you've seen with the same size, black hair and fair complexion, other than this defendant. Isn't that correct? You can't swear positively, isn't that right?
A. I can't swear positive, but in my opinion he looks very much like the man behind my counter.
Tr. 51–52 (footnote from original).

6. A. I couldn't make a positive identification because the man behind my counter was holding a handkerchief over his face, like this. But there is someone from the color of his hair and his complexion, in my opinion, I believe I see one man in here that was behind my counter.
Tr. 46 (footnote from original).

7. Q. With his left hand, I see. Now did you at any time see the person without the handkerchief over his face?
A. No, I didn't.
Tr. 47 (footnote from original).

8. Q. Now were you able to see this person's face clearly, the one that went behind the bar?
A. He held a handkerchief to his face partially obscuring it.
Q. Partially obscuring it.
A. Obscuring the nose and the mouth.
Tr. 58–59 (footnote from original).

9. Q. Mr. Ruiz, did you at any time see this person without the handkerchief over his face?
A. At the show-up.
Q. No, I mean at the time of the robbery.
A. No.
Tr. 67 (footnote from original).

10. Q. Was there any other identifying mark such as a scar or anything that made you remember this man?
A. No.
Tr. 62 (footnote from original).

11. Tr. 74.

12. Q. Let the record reflect the witness has pointed to the defendant at the bar. Now, Mr. Alfonso would you please explain upon what you base this identifica-

Finally, there was Muriel Langston, the bar maid. She did see the entire face of the robber "when he went to get in his pockets (and) the handkerchief went down in his hand and he went into his pockets and I saw his face perfect."[13] She identified the accused as the robber without doubt.[14] The cross-examination of Mrs. Langston was vigorous, and both prosecution and defense might well have concluded that the jury would have reasonable doubt of her accuracy and veracity.

▮ Considering the disputed testimony in context, we cannot conclude that its admission was harmless "beyond a reasonable doubt". The testimony, with its inference on the issues of identification and guilt, may well have tipped the scales toward a guilty verdict. Without the disputed testimony, the prosecution had a questionable case, based as it was on two tentative identifications based on build, hair color, and complexion, one dubious positive identification, and one vigorously challenged positive identification.[15] With the disputed testimony, the prosecution's case was far stronger. The testimony added two inferred "reliable" identifications and, inherently, two assertions as to guilt.

It cannot be said "I am at a loss to understand how any normal jury, as we must assume this one to have been, could be led to believe, let alone be influenced by [the witness' testimony as to the out-of-court declarants' statements]". Dutton v. Evans, *supra*, 400 U.S. at 91, 91 S.Ct. at 221, 27 L.Ed.2d 213. (Blackmun, J., with whom the Chief Justice joins, concurring). The testimony does not "[fade] into practical and legal insignificance". Id., 400 U.S. at 93, 91 S.Ct. at 222. Nor are we dealing here with "gossamer possibilities of prejudice to a defendant [which serve to] . . .

---

tion and on how strong you feel about this identification?

A. Well, he looked similar to the man that was in the bar, like I said I couldn't see his face completely to make a real positive identification but the general physical build and what I saw of his hair and. he just seemed like that was the person.

Tr. 74 (footnote from original).

13. Q. Would you please tell the gentlemen of the jury the circumstances surrounding the robbery, what happened?
A. At around five to eleven a fellow come in and ordered a draft beer. He drank two swallows out of the beer and he left. Not even five minutes later, I didn't even have time to sit down, he come back in and when he came back in another guy came right with him. The redhead had a gun and he come to us and the other guy jumped over the bar. The one with the gun said, this is a stickup. Don't do anything and no bloodshed, or something like that and nobody will get hurt. The other one was behind the bar and the redhead told me to go get the other guy the money. He got the money really, you know, he got the money. And the other guy said open up the top register. And I couldn't open it. I was too nervous. So I told my boss, you'd better come back here and open it. When my boss got behind there and opened, the redhead said while you're back there, get his pockets and when he went to dig in his pockets the other guy had a handkerchief over his face all the time. And when he went to get in his pockets the handkerchief went down in his hand and he went into his pockets and I saw his face perfect.

Tr. 78–79 (footnote from original).

14. Q. Now Mrs. Langston, I want you to think about this question and I want you to answer it as precisely as you can. Do you see the person in this courtroom today who was one of the persons who robbed you on November 17, 1966?
A. Yes, I do.
Q. Would you please point this person out?
A. Yes.
Q. Let the record reflect that the witness has pointed to the defendant at the bar. Mrs. Langston, is there any doubt in your mind as to whether or not this is the man?
A. No, there's no doubt. That is him.
Q. Are you positive?
A. Very positive.
Tr. 81 (footnote from original).

15. The in-court identifications must also be considered in the context of a questionable lineup procedure.

nullify a sentence . . . and set the guilty free". Snyder v. Massachusetts, 1934, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674, 687, quoted in Dutton v. Evans, *supra,* 400 U.S. at 89–90, 91 S.Ct. 210, 27 L.Ed.2d 213. The error is not "harmless beyond a reasonable doubt".

The district court's order granting Favre's application for a writ of habeas corpus is affirmed.[16]

CLARK, Circuit Judge (dissenting):

From a technical legal view, the opinion of Judge Rubin and Judge Wisdom's affirmance are antiseptically sound. With all due deference to their scholarship, I am compelled to dissent by my sense that this evidentiary error was beyond a doubt harmless.

At the outset I would note that we are not involved with the clearly erroneous rule. The normal deference due to a district court's resolution of a fact or mixed fact-law issue is not apropos here; for he, as we, view only the same cold record.

Perhaps my dissent is provoked because I give too great a deference to the inherent intelligence of the jury and the independent review by the state trial judge who heard the proof, or perhaps I perceive a different legal standard for our federal review from Dutton v. Evans, *supra,* and Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). In either event, my concern as to the magnitude of the error does not go just to its effect on Louisiana's system of justice, although that would be enough. Rather, my anxiety is for witnesses, such as Muriel Langston, everywhere; who must endure yet another judicial ordeal they really want no part of in the first instance. I greatly fear that her devastating identification testimony (set out in footnotes 13 and 14 above) about this terrifying armed robbery which was perpetrated almost six years ago will be lost or rendered substantially ineffectual by old age in the retrial that must now be held.

If it is lost or debilitated, the search for truth will be the loser. Ironically, it

---

16. As the district court's original opinion points out, the decision in this case does not preclude the use of informers' statements.

In some situations the Supreme Court has held that the Sixth Amendment does not require the disclosure of the identity of informants. Thus, the states seem not to be constitutionally required to disclose to the accused the name of an informer. McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). But the state may not *both* introduce an unidentified informant's statement at a trial on the merits and at the same time maintain his anonymity. If the state does not wish to disclose the identity of the informant and produce him, it must forego his testimony, else the accused is denied "the right of confrontation * * * an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Pointer v. State of Texas, *supra,* 380 U.S. at 405, 85 S.Ct. at 1068; see also Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

318 F.Supp. at 1386. Nor does our decision affect the determination of probable cause.

In McCray [v. Illinois, 1967, 386 U.S. 300, 87 S.Ct. 1056, 19 L.Ed.2d 72] the court approved the use of testimony of an unidentified informant as a basis for issuance of a search warrant. Hearsay may, and frequently does, establish probable cause. But this does not mean it is admissible as proof of guilt.

What is adequate to justify an arrest or a search for evidence while a charge is under investigation may not be admissible at the time of trial. It is necessary in many instances to distinguish between the rights of the suspect before he is brought to trial and his rights after he is arraigned and trial commences. The right to confrontation is basically a trial right, whose strictures have often been found inapplicable to earlier stages in the criminal process. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397; *cf.* Barber v. Page, *supra;* 390 U.S. at 725–726, 88 S.Ct. 1318. The *McCray* opinion recognized this distinction, and it is, indeed, implicit in the Constitution itself. For the rights preserved in the Fourth Amendment are different from those safeguarded by the Sixth.

318 F.Supp. at 1386–1387.

is that same essence—truth—which is supposedly at the heart of Favre's enjoyment of the right of confrontation so zealously protected today.

Finally, it is altogether anomalous to assert that the due process clause of the Fourteenth Amendment cannot be invoked to invalidate a conviction in which the *only* identification testimony consists of a single inconsistent statement of one witness[1] and at the same time say in the present case that because the evidentiary complaint is cast in terms of Sixth Amendment confrontation, it must result in vacating a jury verdict based on a much more solid foundation.

I would reverse the grant of habeas corpus relief.

### ON PETITION FOR REHEARING

CLARK, Circuit Judge (dissenting):

For the reasons set out in my dissent to the panel's original opinion, I dissent from the court's refusal to grant rehearing. As to the harmlessness of the error presented here, *see also* Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), decided since the panel opinion was released.

---

1. See Edwards v. Wainwright, 461 F.2d 238 (5th Cir. 1972).