398 So.2d 851 (1981)
Larry POSTELL, Appellant,
v.
The STATE of Florida, Appellee.
No. 79-1901.
District Court of Appeal of Florida, Third District.
April 28, 1981.
Rehearing Denied June 3, 1981.
*852 Bennett H. Brummer, Public Defender and Beth C. Weitzner, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen. and Joel D. Rosenblatt, Asst. Atty. Gen., for appellee.
Before HENDRY, DANIEL S. PEARSON and FERGUSON, JJ.
DANIEL S. PEARSON, Judge.
The armed robbery with which Postell was charged and convicted occurred late at night in a dark alley when five black males attacked Alfredo Fernandez and Carlos Lopez.
The criminal episode lasted approximately five minutes. It began when one man approached Lopez's stopped car, pointed a gun at his head and ordered him to pull the car into an adjacent dark alley. In the alley, four more men descended on the vehicle. One pulled Lopez from the driver's seat. When Fernandez turned toward the passenger window, a rock was thrown, hitting him in the head and shoulder area and causing him severe pain. Fernandez was pulled from the vehicle, and he and Lopez were attacked by the five men. Lopez's car, watch and $30.00 were taken, and Lopez and Fernandez were ordered to walk away. According to both victims, two of the robbers left in one vehicle and three in the other.
At trial, Fernandez identified Postell as the person who threw the rock. Lopez was unable to identify Postell as one of the perpetrators. Fernandez acknowledged that he had never seen Postell before, that Postell never spoke to him, and that during the affray his attention was primarily focused on another man holding a gun. He admitted he had difficulty in identifying blacks, and he had variously described the person who threw the rock as short and tall. No physical evidence linked Postell to the crime, and Postell made no statement admitting his complicity. In sum, the State's case against Postell depended solely on the believability of Fernandez's suspect testimony.[1]
To fortify the case against Postell, the prosecutor sought to elicit through the testimony of a police officer, Seymen, the out-of-court declarations of an unidentified woman.[2] According to the State's proffer, the mystery woman's statements would reveal her to have been an eyewitness to the crime who identified Postell as one of the perpetrators. The trial court correctly recognized that the woman's statements were egregious hearsay. It determined, however, that the hearsay rule would not be offended nor the right of confrontation implicated by the admission of all but the woman's words.[3] We find that determination to be error and reverse and remand for a new trial.
The prominent role this mystery woman would play in the trial of the case was heralded in the prosecutor's opening statement:
"Another officer, Officer Eric Seymen, arrived on the scene. He had been dispatched by a report that came into Public Safety of the robbery, a witness who had seen some activity at the time, and based upon a conversation he had with the citizen in the area, an investigation insued [sic] resulting in the arrest of Larry Postell.
"That is the reason he is here before you today, and that is the reason why he is charged with armed robbery."
*853 Officer Seymen, testified he went to the scene of the crime. Over repeated, but overruled, defense objections, he was permitted to go on:
"Q What did you find there?
"A I had a conversation in that area with a particular person.
"Q Was this a male or female?
"A It was a female.
"Q Approximately how long did you converse with this individual?
... .
"THE COURT: How long did you speak to her?
"A Between five and ten minutes.
"Q Officer, how far is this particular location from where you confronted this woman from the scene of the alleged robbery in this case?
... .
"A Within fifteen to twenty yards.
"Q Fifteen to twenty yards?
"A Yes, ma'am.
"Q Did this conversation with this woman take place at approximately the same time that the robbery was being investigated?
"A Yes, it did.
"Q Were you able to determine approximately how long after the robbery this conversation took place?
"A Within minutes.
"Q Based upon your tentative conversation with this woman, what action, if any, did you take?
"A I met with Officers Areu and Laughlin and we responded to the area which was also in the vicinity of the 2100 Block and 75th Street.
... .
"A If my memory serves me correctly, we responded at 21 Northwest 74th Street.
"Q Who lives there?
"A The defendant.
"Q What did you find there?
"A The defendant.
"Q Where was he located?
"A Inside the residence.
"Q Based upon any conversation you may have had with individuals at the scene, including but not limited to Carlos Lopez and Alfredo Fernandez, did you take any further action with respect to this defendant?
"A I handcuffed him."
Laughlin and Areu, the other arresting officers, testified that they abandoned their on-scene investigation and went to seek out Postell after talking to Seymen. Apparently still not satisfied that the picture was clear enough, the prosecutor elicited from Fernandez:
"Q [The Prosecutor]: What happened then?
"A Well, then I think a lady came up to a police car and told them 
"[Defense Counsel]: Objection.
"THE COURT: Sustained.
"Sir, do not say what you heard the lady say to the police officer or the policeman say in response.
"Q Mr. Fernandez, directing your attention to the time of that conversation with this woman but not to the actual conversation itself, after this conversation took place between the police officers and this woman, what, if anything happened?
"A They went to his [the defendant's] apartment."
Finally, the prosecutor administered the coup de grace when she argued to the jury:
"[The Prosecutor]: In the process of returning these two individuals to the scene of this robbery, they confronted another officer, Officer Seymen, and Officer Seymen testified, you will recall, that he had a conversation with a woman within yards of the site of that robbery; that the conversation lasted some ten minutes right at that scene; that as a result of that direct conversation with that woman, the officers were instructed to respond to the home of this defendant, Larry Postell.
"[Sidebar on defendant's mistrial motion omitted]
"[The Prosecutor]: Once again ladies and gentlemen, at the conclusion of this conversation *854 between Officer Seymen and this woman, the officers responded to the home of the defendant.
... .
"Now, ladies and gentlemen, consider what a coincidence it would be to come upon a scene of a robbery within two to three blocks of this defendant's home, within thirty minutes of the robbery, go to the location and find an individual who exactly fits the description given to the police officers before he was ever a suspect by name.
... .
"Let us determine what, in fact, the police did arrest this defendant on.
"Consider the testimony that the two victims of the robbery gave to them, including the description, considerable conversation that was had between a woman and one of the police officers within yards of the scene of the robbery.
"[Defense Counsel]: I am going to object and move for a mistrial on the same grounds as before.
"THE COURT: Denied."
We reject the trial court's wooden application of the hearsay rule and the confrontation clause of the Sixth Amendment. We hold that where, as in the present case, the inescapable inference from the testimony is that a non-testifying witness has furnished the police with evidence of the defendant's guilt,[4] the testimony is hearsay, and the defendant's right of confrontation is defeated, notwithstanding that the actual statements made by the non-testifying witness are not repeated.[5] In so holding, we announce no novel rule.
In Favre v. Henderson, 464 F.2d 359 (5th Cir.), cert. denied, 409 U.S. 942, 93 S.Ct. 235, 34 L.Ed.2d 193 (1972), as in the present case, the critical issue was identification of the defendant. The identification of the defendant was shown by "two tentative identifications," "one dubious positive identification," and "one vigorously challenged positive identification," including "a questionable lineup procedure." To bolster its case, the State called a police officer who testified that he arrested Favre for armed robbery based on information he received from two reliable informants. The informants did not testify, and their statements to the officer were not repeated. The court held that this testimony violated the defendant's right of confrontation[6]:
"Whether offered by the prosecution to establish identification, guilt, or both, the testimony, when considered in light of its logical inferences, is hearsay. `Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' McCormick, Evidence 460 (1954). See generally id. pp. 455-712; Wigmore on Evidence §§ 1361-1769 (1940); Wharton, Criminal Evidence pp. 569-765 (1955). Although the officer never testified to the exact statements made to him by the informers, the nature *855 of the statements as discussed above, was readily inferred. The statements were offered to establish the truth of the matters asserted therein  identification, guilt or both. The truth of the assertions depended upon the credibility of the informers who were not identified, not present in Court, and not subject to cross-examination." Favre v. Henderson, supra, at 362.
In State v. Bankston, 63 N.J. 263, 307 A.2d 65 (1973), the critical issue was whether the defendant possessed the contraband that was found by the police on a tavern counter top near where Bankston had been seated. The State elicited testimony from the police that shortly before arresting Bankston, based upon information received from an informer, they went to the tavern looking for an individual in possession of narcotics, and found an individual who fit the description the police had been given. Affirming the Appellate Division's reversal of Bankston's conviction, the New Jersey Supreme Court said:
"Although in the present case the police officers never specifically repeated what the informer had told them, the inescapable inference from Genzone's testimony was that the informer had given information that defendant would have narcotics in his possession. Thus the jury was led to believe that an unidentified informer, who was not present in court and not subjected to cross-examination, had told the officers that defendant was committing a crime. The testimony was clearly hearsay.
... .
"The State also claims that the inference which the Appellate Division concluded could be drawn from Genzone's testimony is always possible even when a police officer simply testifies that he went to a certain place `based on information received.' However, we are not concerned with mere possible inferences. When the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay.
"In the instant case there was no need for any reference to an informer or to explain that the police were looking for a person described by the clothing he was wearing.[7] There was no allegation that the police were acting arbitrarily. Testimony that they had gone to the tavern `based upon information received' would have been sufficient to explain their actions." State v. Bankston, supra, 63 N.J. 263, 307 A.2d at 69.
In State v. Chernick, 278 S.W.2d 741 (Mo. 1955), again the critical issue was identification of the defendant. Over the defendant's objection, the prosecutor elicited that the Circuit Attorney issued an order for the defendant's arrest after having spoken to one Scholl, ultimately Chernick's co-defendant.[8] Scholl did not testify. The court reversed Chernick's conviction for assault with intent to commit murder, stating:
"The conduct, in itself, of the Circuit Attorney in putting out an immediate *856 arrest order was not material or relevant to any issue of the case, so the fact that Scholl made a statement was not admissible in tending to explain the conduct of the Circuit Attorney. The testimony tending to show the facts that Scholl had made a statement and that the Circuit Attorney immediately put out an arrest order was utilized by State's counsel, over defendant's objection, to show inferentially or circumstantially that Scholl had implicated defendant as a participant in the furtherance of the robbery. The broad inference supported by these facts, and urged and driven home in argument was quite as prejudicial, if not more so, as would have been whatever it was Scholl actually said... . It would seem clear that the same considerations which would have invoked the rule excluding the actual assertions of Scholl would forbid that any inference against defendant should be drawn from the conduct of the Circuit Attorney actuated by what Scholl said. We hold the trial court's action in overruling the objection was prejudicially erroneous.
"The essential principle of the hearsay rule is that for the purpose of securing trustworthiness of testimonial assertions, and of affording the opportunity to test the credit of the witness, such assertions are to made in court, subject to cross-examination." State v. Chernick, supra, 278 S.W.2d at 747-48.
In State v. Jones, 583 S.W.2d 561 (Mo. App. 1979), the investigating detective testified, over the defendant's objection, that after speaking to Wiley, a person who had been identified as a perpetrator of the robbery, he sought to procure the arrest of the defendant Jones. Finding the admission of this testimony grounds for reversal, the court said:
"Clearly it would have been inadmissible, as hearsay, for the state to produce direct evidence that Ed Wiley had `fingered' defendant as the robber. Had the state produced Wiley he would have to testify under oath and be subjected to cross examination. The state avoided this by having detective Young testify that after talking with Ed Wiley he immediately put out an arrest order for the defendant. The implication is clear that Ed Wiley had told Detective Young that defendant was the robber. Defendant was thereby deprived of his right to sworn testimony and the right to confrontation and cross examination." State v. Jones, supra, 583 S.W.2d at 563.
The effect of our holding is to make it impermissible for the State to reap the benefits of the mystery woman's declarations. That is as it should be. Our system demands that the finder of fact determine the believability of any witness and the weight to be given that witness's testimony. That simply cannot be done when the jury is deprived of all opportunity to consider the demeanor of the witness; when the memory, intelligence, and candor of the witness is free from testing; when the bias or interest of the witness cannot be probed; when the witness's opportunity and ability to observe is insulated from questioning; and when, indeed, the witness's identity is totally concealed so as to make her totally unimpeachable. In short, the insidious diminution of the precious rights of confrontation and cross-examination, through some literal application of the rule against hearsay, cannot be tolerated.
We add only that in a case such as this, which exemplifies the judicially recognized hazard of brief eyewitness identification of strangers made under stress, see, e.g., United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Banks v. State, 380 So.2d 1312 (Fla. 3d DCA 1980) (Hubbart, J., dissenting); Jackson v. Fogg, 589 F.2d 108 (2d Cir.1978); United States v. Russell, 532 F.2d 1063 (6th Cir.1976), we must conclude that the error of admitting the hearsay substantially affected Postell's rights to a fair trial.
Reversed and remanded.
NOTES
[1] In addition to the brevity of Fernandez's observation of Postell, the lighting conditions, the stressful circumstances under which the identification was made, and other recited factors, we note that shortly after Postell's arrest, Fernandez was taken to Postell's home where he identified Postell in a one-man showup.
[2] The record is silent as to why the mystery woman was not called as a witness at trial.
[3] Postell's counsel protested that the damage would be the same, and the trial court acknowledged that prejudice would plainly accrue.
[4] We base our holding on the testimony elicited. The mystery woman was portrayed as a "witness who had seen some activity at the time." She was repeatedly portrayed as conversing with the officer "within minutes" of the robbery and "within fifteen to twenty yards" of the scene of the crime. The picture was clear  she had told the officer that she had seen the crime and seen Postell commit it. The fact that the prosecutor's argument urged the jury to draw this very inference merely exacerbates the problem.
[5] Florida courts have consistently condemned testimony which recounts the actual statement made by the out-of-court declarant implicating the accused. See, e.g., Collins v. State, 65 So.2d 61 (Fla. 1953); Kirby v. State, 44 Fla. 81, 32 So. 836 (1902). That condemnation necessarily reaches testimony where the actual statement, although unexpressed, is implicit in the testimony.
[6] The testimony in Favre, set out fully in the opinion, is remarkably like the testimony in the present case. The officer testified that he was investigating a robbery; that in the course of his investigation, he came into possession of information from confidential informants; that he thereafter was seeking to arrest Favre. The prosecutor studiously avoided eliciting from the officer what was said by the informants, and the trial court just as studiously overruled the defendant's objections.
[7] Although it does not appear that Postell objected to the testimony on the grounds of relevancy, we are compelled to point out that the arrest of the defendant is not an element of the crime to be proved, and proof concerning the fact that it occurred, the circumstances of it, and the reasons for it is ordinarily irrelevant. We recognize that it could be argued that the time and place of Postell's arrest, for example, would tend to disprove any contention that Postell was in Philadelphia within an hour of the crime. However, in the present case, Postell's defense was that he was at home in Miami. See State v. Bankston, supra; People v. Wilkins, 408 Mich. 69, 288 N.W.2d 583 (1980).
[8] That the absent "witness" happens to be a co-defendant who does not testify at trial is inconsequential. See also State v. Niesbbalski, 82 N.J.L. 177, 83 A. 179 (1912) (testimony that defendant was arrested upon information received from two co-defendants violated defendant's right to confrontation where necessary inference was that co-defendants had implicated defendant); State v. Johnson, 538 S.W.2d 73 (Mo. App. 1976) (testimony that immediately after speaking to co-defendant, officer arrested defendant, "just as much hearsay and objectionable as the implicating statement itself would have been," deprived defendant of right of confrontation).