GROSS, C.J.
 

 Antonio Carter was convicted after a jury trial of carjacking, strong arm robbery, and felony driving while license revoked. He was sentenced to three concurrent sentences — for carjacking, 40 years as an habitual offender with a prison releasee reoffender mandatory minimum of 30 years; for robbery, 30 years as an habitual offender with a prison releasee reoffender mandatory minimum of 15 years; and, for the felony driving charge, 5 years as an habitual offender. We affirm the carjacking and robbery convictions, and reverse the felony driving while license revoked conviction and the restitution order.
 

 We state the facts at trial in the light most favorable to the state.
 
 [1]
 
 Samuel La-roche, the victim, was a taxicab driver in Broward County. On August 11, 2007, at approximately 11:00 p.m., Laroche picked up two men and a woman near the Yankee Trader hotel. The trio would later be identified as Alvin Bell, Bonnie Broderick, and appellant. Bell, a disabled man, was in a wheelchair. Laroche helped secure the wheelchair in the trunk of his cab, leaving it open for the ride. Once the trio was in the cab, one of the passengers told Laroche to drive them to the Lafayette Motel, which was located a few miles from the Yankee Trader. During the ride, appellant was seated in the passenger side of the front seat, Bell was seated in the driver’s side of the back seat, and Broderick was seated in the passenger side of the back seat.
 

 After they arrived at the motel, Laroche could not find his cell phone, which had been plugged into the cigarette lighter, and which he had used during the ride. Laroche got out of the cab and looked for his phone behind one of the seats. Appellant, Broderick, and Bell also exited the cab. After helping Bell into his wheelchair, appellant went to the driver’s seat and turned the engine off. Appellant then told Laroche he did not want to pay the fare. He also asked Laroche what he was searching for. Laroche replied that he was looking for his phone. Appellant asked if Laroche was accusing him of taking the phone, which Laroche denied. Appellant then struck Laroche with a closed fist.
 

 
 *1241
 
 Laroche fell to the ground. Appellant continued to hit him on the face and neck. As appellant was striking Laroche, Bell told him to stop and to let Laroche go. Once the beating stopped, Laroche stood up and looked for his designer glasses, which had fallen off. Laroche picked up the glasses, but appellant asked for them. Because he was afraid and did not want further confrontation, and because he did not think he had a choice, Laroche gave appellant his glasses. Standing beside the open trunk, appellant called to Laroche, who feared that appellant planned to put him inside. At that point, Laroche ran away.
 

 Appellant slid into the driver’s seat of the cab, started the car, and drove off, along with Laroche’s driver’s license, immigration papers, and money. Laroche entered the motel, where he found Broder-ick. Bell was still outside the motel lobby. Laroche had motel security call the police, to whom he gave descriptions of his three passengers. Laroche described the woman as having tattoos. He said that appellant was a dark-skinned black man with no hair and indicated that the larger of the two men was in a wheelchair. About 20 minutes after appellant drove off, the police found the cab a few blocks from the Lafayette Motel. Laroche never retrieved his driver’s license, immigration papers, cell phone, or money from the car. The car’s ignition key was also missing.
 

 The next day, Officer Chris Wilson, having been made aware of the Laroche carjacking, spotted a white woman with tattoos, a large black male in a wheelchair, and appellant, in a car at a gas station a few blocks from the site of the carjacking. These three people matched the descriptions of persons involved in the carjacking the day before.
 

 Three days after the incident, Detective Jason Wood contacted Laroche and asked him to view several photographs. Without any prompting from Wood, Laroche recognized appellant’s photograph as depicting his assailant. Laroche testified that he was absolutely sure the person in the photograph was the person who struck him and took his car. He did not make an in-court identification of appellant.
 

 The Carjacking Conviction
 

 Appellant challenges his carjacking conviction with the argument that the use of force, a necessary element of the crime, was too disconnected from the taking of the taxicab. However, viewing the evidence in the light most favorable to the state, sufficient evidence exists to sustain the carjacking conviction.
 

 Three elements comprise carjacking: “[1] the taking of a motor vehicle which may be the subject of larceny from the person or custody of another, [2] with intent to either permanently or temporarily deprive the person or the owner of the motor vehicle, [3] when in the course of the taking there is the use of force, violence, assault, or putting in fear.” § 812.133(1), Fla. Stat. (2007). Section 812.133(3)(b), Florida Statutes (2007), further provides that “[a]n act shall be deemed ‘in the course of the taking’ [under element 3] if it occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events.” (Emphasis added.)
 

 Appellant focuses on the third element of section 812.133(1), arguing that his taking of the taxicab was an afterthought to the use of force against Laroche. Appellant relies primarily on
 
 Flores v. State,
 
 853 So.2d 566 (Fla. 3d DCA 2003), but that case is distinguishable on its facts.
 

 In
 
 Flores,
 
 the defendant entered a hair salon and took the purses of its owner and patrons, saying he needed money for legal
 
 *1242
 
 fees in an unrelated matter.
 
 Id.
 
 at 567. He then barricaded the owner and patrons in the salon’s bathroom, took the owner’s car keys, and drove off with her car.
 
 Id.
 
 The third district held that the carjacking charge should be reduced to grand theft.
 
 Id.
 
 The court reasoned that “the use of force” occurred “during the course of the robbery of the [ownerj’s purse in the salon, but not at the time of his subsequent theft of the [ownerj’s automobile outside.”
 
 Id.
 
 at 570. Further, the court wrote, the owner likely did not know of the theft of her car because she was confined to the bathroom.
 
 Id.
 
 The court also noted that, because of the defendant’s announced reason for the robbery, “it appears that his theft of the victim’s car was a fortuitous event occasioned only upon his subsequent discovery of the car keys in [the owner’s] purse as he searched for money.”
 
 Id.
 
 at 570 n. 5.
 

 This case is distinguishable from
 
 Flores
 
 because appellant’s beating of Laroche intertwined with the taking of the taxicab in time and place, so that the use of force occurred “in the course of the taking” within the meaning of section 812.133(3)(b). Appellant turned off the car’s ignition, engaged the victim about not paying the fare, beat the victim, took his glasses, and drove the taxicab away as the victim watched. Thus, the “use of force, violence, assault, or putting in fear” occurred “prior to” the taking of the property in a “continuous series of acts or events.” § 812.133(3)(b), Fla. Stat. (2007). This was unlike the theft of the car in
 
 Flores,
 
 which was an afterthought to the purse robbery inside the hair salon.
 

 The connection between the violence and the taking in this case resembles the situation in
 
 Baptiste-Jean v. State,
 
 979 So.2d 1091 (Fla. 3d DCA 2008). There,
 

 after tying and beating the victim while attempting to discover the location of valuables in his home, Baptiste-Jean and an accomplice pulled his car keys from his pocket, continued to beat him, and left the house taking the stolen items with them. Then, after loading the car which was parked in the driveway, the perpetrator started the vehicle with the keys and drove away.
 

 Id.
 
 at 1092.
 

 The third district held that these facts could support a carjacking conviction, observing that “while the violence involved in taking the keys may have ... occurred ‘prior to’ stealing the car, it took place within a logically interrelated ‘continuous series of acts or events,’ and thus ‘in the course of the taking of the vehicle itself as provided in subsection 812.133(3)(b).”
 
 Id.
 
 (citations omitted).
 

 The Robbery Conviction
 

 Appellant next challenges the sufficiency of the evidence to support the robbery conviction, which was primarily based on the taking of Laroche’s glasses. We reject that argument, because competent, substantial evidence supports the robbery conviction.
 

 Robbery consists of three elements: “[1] the taking of money or other property which may be the subject of larceny from the person or custody of another, [2] with intent to either permanently or temporarily deprive the person or the owner of the money or other property, [3] when in the course of the taking there is the use of force, violence, assault, or putting in fear.” § 812.13(1), Fla. Stat. (2007). As with the carjacking statute, section 812.13(3)(b), Florida Statutes (2007), provides “[a]n act shall be deemed ‘in the course of the taking’ [under element 3] if it occurs either
 
 prior to,
 
 contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events.” (Emphasis added.)
 

 
 *1243
 
 Similar to his argument on the carjacking, appellant attacks the connection between the beating of Laroche and the taking of the glasses. However, the taking and the beating were part of a connected, continuous series of events, so that the use of force can be said to have arisen during the course of the taking. Laroche gave up his glasses because the beating made him afraid. This was sufficient evidence to support the robbery conviction.
 

 Testimony Concerning Appellant’s Companions the Day after the Carjacking
 

 Appellant sought to exclude the testimony of Officer Wilson that the day after the carjacking, he saw appellant in the presence of a black man in a wheelchair and a white, tattooed female at a gas station a few blocks from the site of the crime.
 

 Appellant contends that this evidence was irrelevant and tended to convict him based on his choice of associates. A “trial court has broad discretion in determining the relevance of evidence and such determination will not be disturbed absent an abuse of discretion.”
 
 Heath v. State,
 
 648 So.2d 660, 664 (Fla.1994) (citation omitted). The trial court did not abuse its discretion in admitting Officer Wilson’s testimony.
 

 Three sections of the evidence code provide the framework for evaluating questions of relevance. The general rule is that “[a]ll relevant evidence is admissible, except as provided by law.” § 90.402, Fla. Stat. (2007). “Relevant evidence is [defined as] evidence tending to prove or disprove a material fact.” § 90.401, Fla. Stat. (2007). Section 90.408, Florida Statutes (2007), establishes a limitation on the introduction of relevant evidence: “Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.”
 

 Applying these statutes, Officer Wilson’s testimony about appellant’s companions on the day after the carjacking was relevant because it tended to prove the material fact of the identity of Laroche’s assailant. Identity was an issue at trial; although Laroche identified appellant in a photo lineup, he did not identify appellant as the robber at trial. Officer Wilson’s description of appellant, Broderick, and Bell matched the descriptions that Laroche gave to the police shortly after the crime occurred. Appellant’s association with the unusual combination of a large black man in a wheelchair and a woman with tattoos, in the same vicinity as the crime, tended to prove that he was the third person who got into the cab with them the day before. There was no unfair prejudice in this evidence. Unlike the cases cited by appellant, Officer Wilson’s description of the man in a wheelchair and the woman -with tattoos did not involve the admission of hearsay statements.
 
 Cf. Zuluaga v. State,
 
 915 So.2d 1251 (Fla. 3d DCA 2005);
 
 Postell v. State,
 
 398 So.2d 851 (Fla. 3d DCA 1981). The trial judge did not abuse her discretion in admitting the testimony.
 

 The State Failed to Prove All the Elements of Felony Dñving While License Revoked
 

 Under section 322.34, Florida Statutes (2007), a person commits felony driving on a revoked license when (1) his “driver’s license has been revoked pursuant to s. 322.264 (habitual offender) and [2] [he] drives any motor vehicle upon the highways of this state while such license is revoked.” § 322.34(5), Fla. Stat. (2007). Authorizing a revocation for a “habitual traffic offender,” section 322.264, Florida Statutes (2007), provides:
 

 
 *1244
 
 A “habitual traffic offender” is any person whose record, as maintained by the Department of Highway Safety and Motor Vehicles, shows that such person has accumulated the specified number of convictions for offenses described in subsection (1) or subsection (2) within a 5-year period.
 

 Subsections (1) and (2) of section 322.264 specify the types of convictions that can give rise to the “habitual traffic offender” designation and suspension. Among these are driving a motor vehicle on a suspended or revoked license and “any violation of s. 316.193” (driving under the influence). § 322.264(l)(b), (d), Fla. Stat. (2007).
 

 The state may use a defendant’s driving record from the Department of Highway Safety and Motor Vehicles to prove the fact of a section 322.264 suspension, that the statutory notice was given, and the convictions that gave rise to the suspension.
 
 See Rodgers v. State,
 
 804 So.2d 480, 483 (Fla. 4th DCA 2001). If the record offered by the state fails to designate the requisite convictions to justify the habitual traffic offender designation under section 322.264, then the state has failed to make a prima facie case for a section 322.34 felony violation for driving on a revoked license.
 
 See State v. Byrd,
 
 969 So.2d 581, 582 (Fla. 4th DCA 2007);
 
 Kallelis v. State,
 
 909 So.2d 544, 545 (Fla. 4th DCA 2005).
 

 Here, the driving record offered by the state failed to prove an essential element of the crime because it did not specify the convictions that gave rise to the habitual traffic offender suspension. We therefore reverse the conviction and sentence for felony driving on a revoked license.
 

 Testimony Regarding Laroche’s Identification of Appellant from a Photo Line-up
 

 Appellant moved pretrial to suppress Laroche’s identification of appellant in a photo line-up, arguing that the “procedure used to elicit the identification from eyewitness Samuel Laroche” was unnecessarily suggestive, resulting in a “substantial likelihood of irreparable misidentification.”
 

 At the hearing on the motion to suppress, Detective Wood testified that on the day after the carjacking, he first encountered appellant, white female Bonnie Bro-derick, and Alvin Bell, a black male in a wheelchair, when law enforcement received a call that a black man was beating a white woman. Appellant, Broderick, and Bell were taken into custody in response to the call. At that time, Broderick told the police about the taxicab carjacking from the night before. Her version was consistent with Laroche’s statement. Based on that information, appellant became a suspect in the carjacking.
 

 The Fort Lauderdale Police Department typically uses a sequential line-up where photographs are not on one sheet of paper, but are shown to a witness one at a time. The officers usually compile the line-ups themselves, the photographs are randomly ordered, and officers are taught to select decoy photographs based on like facial characteristics. While Wood had not taken formal classes in compiling photographic line-ups, he had in-house training and experience. Wood created a photographic line-up in which six photographs, including one of appellant, were shown in sequential order. Appellant’s picture was neither the first nor the last shown to Laroche. Wood used photographs of persons who shared appellant’s facial characteristics, but there were some differences.
 

 Before Wood showed the line-up to La-roche, he admonished him that the suspect might not necessarily be in the line-up and that physical characteristics in the photographs, such as hair, may have changed. When Laroche saw appellant’s picture, he
 
 *1245
 
 immediately recognized him, and Wood could see “the fear in his eyes.” Laroche told Wood that he was one-hundred percent positive that appellant was his assailant. Wood testified that he did not pressure Laroche or signal to him in any way when Laroche viewed appellant’s photograph.
 

 Laroche testified that during the incident, he was able to get a good look at his assailant, but he was not able to provide a specific description of him. Several days after the carjacking, Laroche was shown the line-up and Wood neither said nor hinted about which photograph to pick. Consistent with Wood’s testimony, La-roche said that he immediately recognized appellant as his assailant. At the hearing, however, Laroche was not able to identify his assailant in the courtroom.
 

 The trial court denied the motion to suppress and, at trial, allowed the testimony about Laroche’s out-of-court identification of appellant.
 

 In determining whether to suppress an out-of-court identification, trial courts employ a two-step test: “(1) [D]id the police employ an unnecessarily suggestive procedure in obtaining an out-of-court identification!;?] (2) [I]f so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification[?]”
 
 Grant v. State,
 
 390 So.2d 341, 343 (Fla.1980) (citing
 
 Manson v. Brathwaite,
 
 432 U.S. 98, 110, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). Thus, even if a trial court concludes that the procedure is unnecessarily suggestive under step one, it can admit the resulting out-of-court identification under the second step if the identification “possesses certain features of reliability.”
 
 See id.
 
 (citing
 
 Manson,
 
 432 U.S. at 110, 97 S.Ct. 2243). However, if the court determines that the procedure was not unnecessarily suggestive, it need not reach the second step.
 

 To determine whether an identification is reliable, which involves gauging the likelihood of misidentification, a trial court should consider the following factors:
 

 [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness’ degree of attention, [3] the accuracy of the witness’ prior description of the criminal, [4] the level of certainty demonstrated by the •witness at the confrontation, and [5] the length of time between the crime and the confrontation.
 

 Neil v. Biggers,
 
 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The use of these factors has been adopted by Florida courts.
 
 See, e.g., Grant,
 
 390 So.2d at 343 (quoting
 
 Neil,
 
 409 U.S. at 199-200, 93 S.Ct. 375).
 

 Defendant’s argument focuses on the first step of the
 
 Neil
 
 analysis, asserting that his photograph stood out due to perceived differences in the physical characteristics of the persons in the photographic line-up. This court has written that,
 

 [generally, photographic arrays have been upheld where they have included a reasonable number of persons similar to any person then suspected whose likeness is included in the array. Photographs used in lineups are not unduly suggestive if the suspect’s picture does not stand out more than those of the others, and the people depicted all exhibit similar facial characteristics.
 

 State v. Francois,
 
 863 So.2d 1288, 1289-90 (Fla. 4th DCA 2004) (internal citation omitted).
 

 In three cases involving photo line-up identifications similar to the one in this case, Florida courts have ruled that the police did not use an unnecessarily suggestive procedure.
 

 
 *1246
 
 First, in
 
 Green v. State,
 
 641 So.2d 391, 394 (Fla.1994), the supreme court held that a photographic line-up was not unnecessarily suggestive where “[t]he police showed [the victim] an array of six photographs, all of which depicted men with similar characteristics.” The court further found that, “[ajlthough police indicated the suspect was in the photo line-up and [the defendant’s] photograph was darker than the others, there [was] no indication that officers directed [the victim’s] attention to any particular photograph.”
 
 Id.
 

 Next, in
 
 Johnson v. State,
 
 438 So.2d 774, 777 (Fla.1983), the supreme court did not find a line-up to be unnecessarily suggestive when the defendant argued that “he had a suntan and blonde hair and his inmate uniform was a lighter blue than that of the other inmates in the lineup.” In so holding, the court remarked that witnesses did not indicate that either of the two complained-of differences influenced their identifications.
 
 Id.
 

 Finally, in
 
 Pierre v. State,
 
 990 So.2d 565, 570 (Fla. 3d DCA 2008), the third district held that a photographic line-up was not unnecessarily suggestive, focusing on the fact that the police officer who administered the line-up “told the victim ... to focus on faces, not hairstyles, because hairstyles may change.”
 

 In the instant case, the trial court based its determination that the line-up was not unnecessarily suggestive on its finding that “[t]here was not one glaring photo that would suggest that the defendant would stick out more so than anybody else.” Officer Wood did not indicate to Laroche which photograph he should choose, nor did he tell Laroche that a suspect was in the line-up. As in
 
 Pierre,
 
 Wood gave La-roche the standard admonition that physical characteristics, such as hair, may have changed. Substantial competent evidence supports the trial court’s ruling that the police’s handling of the photographic lineup was not unnecessarily suggestive.
 

 Sentencing Issues
 

 We find that the state offered adequate proof of appellant’s previous conviction and release from prison.
 

 We reverse the restitution order because the trial court abused its discretion by not holding a restitution hearing before ordering appellant to pay restitution. Section 775.089(l)(a), Florida Statutes (2007), requires that a court “order the defendant to make restitution to the victim ... unless it finds clear and compelling reasons not to.” “Subsections 775.089(6) and (7) require a hearing!, before restitution is imposed,] to determine both the defendant’s ability to pay and the amount owed.”
 
 Exilorme v. State,
 
 857 So.2d 339, 340 (Fla. 2d DCA 2003).
 

 This case is controlled by
 
 L.S. v. State,
 
 975 So.2d 554 (Fla. 4th DCA 2008). In the final hearing on a delinquency petition in that case, the owner of the vehicle testified as to the dollar amount of the damage done to his car by the child.
 
 Id.
 
 at 555. After finding the child guilty of delinquency, the trial court imposed restitution, basing its amount on the hearing testimony of the owner.
 
 Id.
 
 We held that the trial court erred by imposing restitution without notice or hearing:
 

 While the testimony ... was sufficient to prove guilt, it was not by itself sufficient to fix the amount of restitution at that point. Nothing in the record up to that point placed the child on notice that the amount of restitution would be determined solely on the basis of the evidence adduced at the [final hearing].... Without such notice, the child [could not know] he would have to offer evidence as to the amount of any potential restitution at the hearing to determine
 
 *1247
 
 whether he was even guilty of the charge.
 

 Id.
 

 Similar to
 
 L.S.,
 
 the court in this case based its restitution order on Laroche’s testimony at trial. At sentencing, the trial court broached the issue abruptly, segueing from argument on the length of incarceration to restitution. Appellant timely objected to a restitution award without a hearing. Additionally, the trial court did not consider appellant’s financial resources or ability to pay.
 
 See
 
 § 775.089(6)(b), Fla. Stat. (2007);
 
 Filmore v. State,
 
 656 So.2d 535 (Fla. 4th DCA 1995). For these reasons, we reverse the restitution order and remand for an evidentiary hearing.
 

 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
 

 TAYLOR and HAZOURI, JJ., concur.
 

 [1]
 

 .
 
 Vasquez v. State,
 
 763 So.2d 1161, 1162 n. 2 (Fla. 4th DCA 2000) (citing
 
 Brennan v. State,
 
 754 So.2d 1, 3 (Fla.1999)).